Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 4, 2004      Decided November 9, 2004

No. 03-1371

UNITED SERVICES AUTOMOBILE ASSOCIATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with
No. 04-1001

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

*Andrew M. Kramer* argued the cause for petitioner. With
him on the briefs was *Michael D. Malfitano*.

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

*Joan E. Hoyte*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, and *Aileen A. Armstrong*, Deputy Associate General Counsel. *Charles P. Donnelly*, Supervisory Attorney, entered an appearance.

Before: ROGERS, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: When an employee anonymously distributed fliers after working hours expressing coworkers' concerns about the company's layoffs of long-term employees, the company interrogated her about who was involved. Fearing retaliation, she was evasive in her responses. When she later admitted to the general manager of the company that she had distributed the fliers, she was discharged for lying during the interrogation. The National Labor Relations Board ruled that the company violated section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) (2000), by interrogating the employee about concerted activity protected under section 7 of the Act, *id.* § 157, and by terminating the employee for engaging in such activity. The company contends on appeal that the employee's concerted activity was not protected under section 7 because it violated the company's valid workplace rules, and that even if the activity was protected, the company did not violate section 8(a)(1) because it had legitimate business reasons for questioning the employee about her hours and work. Further, the company contends that it properly discharged the employee for lying, irrespective of her concerted activity.

We deny the petition for review. The company fails to show that the Board erred in finding that the workplace rules were invalid because overly broad or not clearly disseminated to employees. The company also fails to show that the Board erred in finding, without relying on the *Bourne* factors,[1] that the interrogation was coercive in view of the company's admissions and the questions asked. Finally, the company fails to show that the Board erred in not engaging in the

---

[1] *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964).

*Wright Line* analysis[2] when the evidence showed that the employee was discharged for a single unlawful purpose. Accordingly, we grant the Board's cross-application for enforcement of its order.

## I.

The United Services Automobile Association, a non-union business, provides insurance and financial services to the military community. Headquartered in Texas, the company has a regional office in Tampa, Florida, consisting of a six-story gated compound with security guards and cameras monitoring the entrance. The company employs approximately 1600 employees who work various shifts, normally between 7:30 a.m. and 6:30 p.m. Because many employees keep claimants' confidential information on their desks, it is common knowledge that employees may not look through the work files on each other's desks unless they have a business need to do so. The company's employee handbook, issued March 2001, contained a "Workplace Solicitation" policy that stated: "Advertising or distributing any non-[company] printed information including fliers, business cards, brochures, or catalogs is not permitted at any time in the work area and only during non-working hours in non-work areas."

On July 31, 2001, Loretta Williams, an insurance adjuster at the company, anonymously distributed approximately 1300 fliers throughout the building between 8 p.m. and 11 p.m. after normal working hours. This followed several weeks of discussion with her coworkers regarding their dissatisfaction with the manner in which the company was laying off long-term employees pursuant to a reorganization plan. The fliers criticized the company's layoffs and requested employees wear a red ribbon in support of their former colleagues. Williams placed the fliers on employees' desks, at the ends of hallways, and in employees' mailboxes. The following day, August 1, the Senior Vice President and General Manager of

---

[2] *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981).

the company, General Thomas V. Draude, sent an email to the managers instructing them not to remove the fliers, to let employees "grieve" the loss of laid-off employees, and to advise employees that distributing non-company printed information in the workplace violated the no-solicitation policy. The following week, on August 6, General Draude left a voice-mail message for all employees explaining that managers had begun to collect the fliers because of the no-solicitation policy.

On August 9, Williams's supervisor, Eileen Hale, asked Williams to accompany her to the personnel office. There Williams was introduced to Sheila Christy–Martin, the director of the human resources advisory team, who proceeded to question Williams for the next hour about safety, overtime, and a possible breach of security with regard to distribution of the fliers. Christy–Martin told Williams that she had been clocked leaving the building at 11 p.m. and asked if she had been working during that time. Williams responded that she had been working on her files. When asked if she had seen anything unusual, Williams said no and that even if she had she would not say because she was afraid of retaliation. Upon further interrogation, Williams became upset and said that she was very uncomfortable with the line of questioning and did not think the questioning was valid. She also said that she did not want to answer any questions about the fliers because she thought she needed an attorney. Christy–Martin then told Williams that the company's only concern was that the distribution violated the company's no-solicitation policy, and that Williams had been seen on the security camera entering the building at 7 p.m carrying a large box. When asked about the contents of the box, which held the fliers, Williams said it contained "papers." Williams then stated that she did not want to answer any more questions, and she refused to give Hale her July 31 overtime hours as she had repeatedly explained during the interrogation that she was not claiming overtime.

Six days later, Williams told General Draude that she was responsible for distributing the fliers. Although Williams explained that she was purposefully evasive during the interrogation due to fear of retaliation, General Draude fired her,

effective immediately, for lying during the interrogation. Williams subsequently received a check for the overtime on July 31 that she did not claim. In November 2001, the company modified its no-solicitation policy, replacing the words "working hours" with "working time."

The Board, adopting the findings and conclusions of the Administrative Law Judge ("ALJ"), concluded that the company violated section 8(a)(1) of the Act by unlawfully interrogating Williams and another employee, Andrew Snyder, regarding concerted activity that was protected under section 7, and by unlawfully discharging Williams for engaging in that activity. The Board also found that the company had maintained an unlawful no-solicitation policy that was overly broad. The Board ordered the company to, among other things, rescind the policy and to offer Williams full reinstatement. The company petitioned for review, and the Board filed a cross-application for enforcement of its order.

## II.

An employer violates section 8(a)(1) of the Act by coercively interrogating an employee about concerted activity that is protected under section 7 of the Act. *See Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998); *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 296 (6th Cir. 1985), *cert. denied*, 476 U.S. 1159 (1986). In deciding whether an interrogation violates section 8(a)(1), the Board must make three determinations. First, the Board must determine whether the employee engaged in concerted activity protected under section 7 of the Act. Because such a determination "implicates [the Board's] expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference" by this court. *NLRB v. City Disposal Sys. Inc*, 465 U.S. 822, 829 (1984). Second, the Board must determine whether, "under all the circumstances," the employer's interrogation "reasonably 'tends to restrain, coerce, or interfere with rights guaranteed by the Act.'" *Perdue Farms*, 144 F.3d at 835 (quoting *Rossmore House*, 269 N.L.R.B. 1176, 1177 (1984), *aff'd sub nom. Hotel Employees & Rest. Employ-*

*ees Union, Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985)). To reach that conclusion, the Board need not find that the employer's "language or acts were coercive in actual fact," *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 745 (4th Cir. 1998), but only that it had a "tendency to coerce" employees. *Avecor, Inc. v. NLRB*, 931 F.2d 924, 932 (D.C. Cir. 1991); *accord Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 954 (D.C. Cir. 1988). Third, the Board must determine whether the employee's interests in exercising section 7 rights are outweighed by the employer's "substantial and legitimate business justification[s]" for interfering with those rights. *Medeco*, 142 F.3d at 745. Because Congress has vested the Board, and not the courts, with the primary responsibility "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy," *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967) (quoting *NLRB v. Great Dane Trailers*, 388 U.S. 26, 33–34 (1967)), the court will deny a petition for review if the Board's balancing is rational and consistent with the Act. *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 504 (1978).

The Board's factual findings, if supported by substantial evidence in the record as a whole, are conclusive even if a reviewing court on *de novo* review would reach a different result. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951); *Perdue Farms*, 144 F.3d at 834–35. The court will uphold the Board's adoption of an ALJ's credibility determinations unless "those determinations are 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998) (quoting *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998); and *Elastic Stop Nut Div. of Harvard Indus., Inc. v. NLRB*, 921 F.2d 1275, 1281 (D.C. Cir. 1990)).

As the Board states in its brief, "all the factors of a classic independent Section 8(a)(1) unlawful interrogation are present in this case." Resp't's Br. at 30. Although the company admits in its reply brief that Williams engaged in concerted activity when she distributed the fliers, the company contends

that such activity was unprotected by the Act. General Draude's August 1 email instructed the managers to let the employees "grieve," implicitly referencing employees' concerns about the layoffs. The director of human resources Christy–Martin nevertheless interrogated Williams about her after-hours activities on July 31 because the company suspected she was responsible for distributing the fliers addressing the layoffs and wanted to know who else was involved. We are unpersuaded the interrogation was lawful because Williams lost the protection afforded by the Act when she distributed the fliers in violation of valid workplace rules.

**A.**

The Board's finding that Williams's anonymous distribution of the fliers was concerted activity protected under section 7 of the Act[3] is supported by substantial evidence in the record. The fliers urged employees to show support for laid-off colleagues and criticized management's selection of employees for layoff. As this court has recognized, concerted activity includes "circumstances where individual employees seek to initiate or to induce or to prepare for group action." *Meyers Indus.*, 281 N.L.R.B. 882, 887 (1986). Similarly, "an individual who brings a group complaint to the attention of management is engaged in concerted activity." *Prill v. NLRB*, 755 F.2d 941, 954 (D.C. Cir. 1985).

The company's contention that Williams's concerted activity was unprotected under section 7 because it violated the company's no-solicitation policy is unavailing. It is long settled that a rule prohibiting employee solicitation and distribution of materials during non-work time and in non-work

---

[3] Section 7 of the Act provides that "[e]mployees shall have the right to ... engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) of the Act enforces section 7 rights by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [those] rights" *Id.* § 158(a)(1); *see Am. Postal Workers Union v. NLRB*, 370 F.3d 25, 26–27 (D.C. Cir. 2004).

areas is presumptively invalid "absent a showing by the employer that a ban is necessary to maintain plant discipline or production." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 571 (1978) (citing *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798–99 (1945)); *Rest. Corp. of Am. v. NLRB*, 827 F.2d 799, 806 (D.C. Cir. 1987). The company's employee handbook of March 2001 contains a written policy prohibiting solicitation and distribution of non-company materials "at any time in the work area and only during non-working hours in non-work areas." Under Board precedent, a no-distribution rule using the term "working hours" (as opposed to "working time") is presumptively invalid. *Our Way, Inc.*, 268 N.L.R.B. 394 (1983). As interpreted and explained by General Draude in his August 1 email to the managers, the policy prohibits "distributing non-[company] printed information *in the workplace*" (emphasis added) (internal quotation marks omitted)— meaning in both work and non-work areas during work and non-work time. One manager, David Huffman, sent excerpts of that email to his employees, noting that the no-solicitation policy banned distribution of non-company materials "in the workplace." General Draude's company-wide voice mail of August 6 likewise advised employees that managers picked up the fliers "because the company's non-solicitation policy says you can't distribute non-[company] material *in the building*" (emphasis added). Thus, there was substantial evidence from which the Board could properly conclude that the policy, as interpreted and communicated by the management to the employees, is presumptively unlawful because it operates as a blanket prohibition of employee solicitation and distribution of non-company materials, even during non-work time, such as during breaks and mealtimes, and in non-work areas, such as in lunchrooms and lounge areas. *See Mercury Marine–Div. of Brunswick Corp.*, 282 N.L.R.B 794, 794–95 (1987).

Rather than offer evidence of special business circumstances related to production, efficiency, or discipline to justify the management's interpretation of the no-solicitation policy, the company contends that the Board erred in finding the entire policy invalid, as the written policy has a valid component restricting solicitation and distribution in "work areas."

This contention defends the legality of the company's written policy, rather than the policy as explained to employees by management. The Board correctly noted that the company did not except to the ALJ's failure to rule expressly on the legality of the written policy in the March 2001 handbook, and hence that issue was not before it. While the company may nevertheless rebut the presumptive invalidity of its policy by showing that it applied or communicated the policy "in such a way as to convey an intent to permit solicitation during nonworking time," *Our Way, Inc.*, 268 N.L.R.B. at 411, or in non-work areas, General Draude's email and voice mail, as well as Huffman's email excerpting General Draude's email, make clear that the ban is not limited to work areas. The existence of a revised written policy does not moot the Board's remedial order directing the company to rescind its unlawful policy. Although the Board noted that the company admitted in its brief to the Board that its written policy in the March 2001 handbook "may have been overly broad," by challenging the Board's decision, the company has failed to show that it has repudiated its former policy, much less assured employees that it will not apply the policy in the future to interfere with their protected rights. *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 (D.C. Cir. 2003).

The company's contention that Williams's activity lost section 7 protection because it violated the company's unwritten no-access policy also fails. The Board found that the company had not shown that its no-access policy was "clearly disseminated" to employees, and its finding is supported by substantial evidence in the record. *Id.* at 109 (quoting *Tri–County Med. Ctr., Inc.*, 222 N.L.R.B. 1089, 1089 (1976)). The ALJ dismissed the company's evidence that its supervisors had met with and notified employees about restrictions on building access because the only supervisor at the hearing, Hale, could not explain how or when this policy had been disseminated to employees. The ALJ credited Williams's testimony, and that of another employee, Valerie Toloday, that they had previously accessed the work areas of other employees to distribute non-company materials and had never been questioned. Other evidence indicated that employees

routinely accessed each other's desks, break rooms, and restrooms throughout the building, distributing invitations, magazine articles, Avon catalogs, and the like. To overcome this damaging evidence, the company takes out of context Williams's testimony that she understood she was not to rifle through confidential matters on other employees' desks, which the company makes no claim she did. In sum, the Board properly found that the company failed to demonstrate that the no-access policy had been clearly disseminated to employees or enforced by the company.

### B.

Because the company interrogated Williams to identify the employees involved in section 7 concerted activity, the Board reasonably concluded that the interrogation was unlawful. *Cf. TRW–United Greenfield Div. v. NLRB*, 637 F.2d 410, 418 (5th Cir. 1981); *NLRB v. Solboro Knitting Mills, Inc.*, 572 F.2d 936, 939–40 (2d Cir. 1978). The unlawful nature of the interrogation is evidenced by General Draude's testimony that the company had already concluded that an employee had written the fliers, and that Williams was the "strongest candidate" for having distributed the fliers because the July 31 security records showed Williams entering the building with a large box and leaving after authorized work hours. General Draude admitted that Williams was questioned because the company wanted to know who else was involved in distributing the fliers. Christy–Martin, the director of human resources who conducted the interrogation, testified similarly that, because the fliers were in the work area, the company wanted to know who had handed them out. There is, then, substantial evidence in the record to support the Board's finding that the employees could reasonably believe that the company had only one objective in questioning Williams and the other employee:[4] to identify, with certainty,

---

[4] Although the company may not have preserved its challenge regarding Snyder because the company raises the issue only in a footnote to its brief, *see Hobson v. Wilson*, 737 F.2d 1, 50 n.144 (D.C. Cir. 1984); *cf. Cal. Dep't of Water Res. v. FERC*, 306 F.3d

who had engaged in the protected concerted activity. *See Allegheny Ludlam Corp. v. NLRB*, 104 F.3d 1354, 1359 (D.C. Cir. 1997).

Contrary to the company's contention, the Board did not err by failing to apply the five-factor test set forth in *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964), in evaluating whether the interrogation of Williams was coercive. As the court has stated, the "flexibility and deliberately broad focus of this test make clear that the *Bourne* criteria are not prerequisites to a finding of coercive questioning, but rather useful indicia that serve as a starting point for assessing the 'totality of the circumstance.'" *Perdue Farms*, 144 F.3d at 835 (quoting *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1178 (D.C. Cir. 1987)). Requiring the Board to address each of the *Bourne* factors where the employer has admitted an unlawful motive for the interrogation would transform a flexible tool for organizing section 8(a)(1) analysis into a rigid hurdle divorced from its purpose of ensuring that non-threatening interrogation is not deemed an unfair labor practice. *See Bourne*, 332 F.2d at 48; *see also NLRB v. Milco, Inc.*, 388 F.2d 133, 137 (2d Cir. 1968).

The company's admission of its unlawful motive for inquiring into its employees' concerted activity belies its contention that it interrogated Williams for legitimate business reasons. *See NLRB v. Hale Container Line, Inc.*, 943 F.2d 394, 401 & n.50 (4th Cir. 1991) (citing *L'Eggs Prod., Inc. v. NLRB*, 619 F.2d 1337, 1343 (9th Cir. 1980)). The Board did not fail, as the company contends, to strike an appropriate balance between the company's asserted business justifications and its

---

1121, 1126 (D.C. Cir. 2002) (citing *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)), we need not address that question. The company states in its brief that it is challenging the Board's finding that it unlawfully interrogated Snyder on the same grounds as it challenges the finding regarding Williams's interrogation. Petitioner's Br. at 39 n.9. Based on the reasoning underlying our disposition of the company's challenge to the Board's finding regarding Williams, we affirm the Board's finding that the company unlawfully interrogated Snyder.

interference with Williams's exercise of her section 7 rights. It found that the company's justifications were pretextual, and its finding is supported by substantial evidence in the record. The ALJ discredited as "not believable" General Draude's testimony that concerns about building security and overtime pay prompted the interrogation of Williams. The Board reasonably came to the "inescapable" conclusion that the security concern was pretextual "because, from [the company's] own security records, the [company] already knew the employees who were in the building that evening." As for overtime pay, the company cites federal regulations precluding an employer from accepting the benefits of an employee's work without paying for it, 29 C.F.R. §§ 785.11, 785.13 (2004), but the regulations do not authorize an employer to coercively interrogate an employee. Furthermore, the company fails to show that it ever questioned another employee about failing to claim overtime for remaining in the building after a shift, or forced an employee over objection to claim overtime.

## C.

The company's contention that it could lawfully terminate Williams for lying during the interrogation, even if her discharge was also motivated by retaliation against her for distributing the fliers, is without merit. *See Spartan Plastics*, 269 N.L.R.B. 546, 552 (1984). There was substantial evidence in the record to support the Board's finding that Williams had responded evasively during the interrogation because she feared retaliation against her for engaging in protected concerted activity. The Board was thus warranted in concluding that Williams had no obligation to respond to the questions in any particular manner and that her dishonesty about her protected concerted activity did not constitute a lawful reason to discharge her. *See id.*; *Jay Foods, Inc. v. NLRB*, 573 F.2d 438, 444 (7th Cir.), *cert. denied*, 439 U.S. 859 (1978). The cases on which the company relies—*Aroostook County Regional Ophthalmology Center v. NLRB*, 81 F.3d 209 (D.C. Cir. 1996), and *Earle Industries, Inc. v. NLRB*, 75 F.3d 400 (8th Cir. 1996)—are inapplicable because they involved employees who violated their employers' lawful poli-

cies. While the Eighth Circuit in *Earle* stated that the Board's "leeway" for misconduct connected to protected concerted activity was "too blunt an instrument when applied without regard to the situation in which the misconduct took place," in that case the employee had engaged in "flagrant" misconduct, disrupting operations at the employer's plant and defying the personnel manager in front of a crowd of employees, in the course of asserting her section 7 rights. *Id.* at 405, 407; *Spartan Plastics*, 269 N.L.R.B. at 551. Here, by contrast, Williams's section 7 activity did not violate any lawful company policy, and the company does not contend her conduct was flagrant. Because there was substantial evidence in the record to show that the company had a single unlawful motive for questioning Williams, the *Wright Line* analysis is inapplicable. *Felix Indus.*, 331 N.L.R.B. 144, 146 (2000), *rev'd on other grounds*, 251 F.3d 1051 (D.C. Cir. 2001).

Further, the Board reasonably rejected the company's contention that it would have discharged Williams even if she had not distributed the fliers, because of its core value of honesty. Although the company had previously terminated employees for falsifying time and attendance records and for petty theft, none of those employees were engaged in protected activity, and their outright dishonesty was not comparable to Williams's failure to volunteer information during an unlawful interrogation. The ALJ credited evidence, moreover, that the company's core value was malleable, including a former manager's testimony that the company had urged him to turn a blind eye to charges of sexual harassment. The ALJ therefore concluded that the company's asserted business justifications for discharging Williams were pretextual. As the Board explained, quoting *Spartan Plastics*, 269 N.L.R.B. at 552, "it can be no defense to [the company] to recite a wrong [by Williams] in responding to an action of [the company] which itself constituted a violation of law."

Accordingly, we deny the petition for review and grant the Board's cross-application for enforcement of its order.