# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 18, 2016         Decided August 19, 2016

No. 14-1253

OZBURN-HESSEY LOGISTICS, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
INTERVENOR

———

Consolidated with 14-1289, 15-1184, 15-1242

———

On Petitions for Review and Cross-Applications
for Enforcement of Orders
of the National Labor Relations Board

———

*Benjamin H. Bodzy* argued the cause for petitioner. With him on the briefs was *Stephen D. Goodwin*.

*David A. Seid*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the briefs were

*Richard F. Griffin*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Katharine J. Shaw* argued the cause and filed the briefs for intervenor. With her on the briefs was *Amanda M. Fisher*.

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: This appeal is the latest chapter in an ongoing labor dispute between Ozburn-Hessey Logistics, LLC (OHL or the Company) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the Union). In 2009, the Union began a campaign to organize workers at the OHL's warehouse facilities in Memphis, Tennessee. That campaign culminated in a July 27, 2011, representation election, which the Union won by a one-vote margin. The National Labor Relations Board (the Board) found that the Company committed multiple unfair labor practices during the months leading up to the representation election. OHL violated the National Labor Relations Act, the Board determined, by threatening, interrogating, and surveilling employees; creating the impression of such surveillance; confiscating union-related materials; urging union supporters to resign; and disciplining two employees because of their pro-union views. In that same decision, the Board resolved pending ballot challenges and objections arising from the July 27, 2011, representation election and directed the Board's Regional Director to count six of the remaining challenged ballots, resulting in a wider margin of

victory for the Union. Pursuant to that revised election tally, the Board's Regional Director certified the Union as the exclusive bargaining representative for the Company's Memphis employees. The Company nonetheless refused to bargain with the Union, prompting a separate Board decision determining that OHL violated the Act.

The Company petitions for review, raising multiple objections to the Board's underlying decisions. We have accorded the Company's arguments full consideration after careful examination of the record, but address in detail only those arguments that warrant further discussion. Having found no basis to disturb the Board's well-reasoned decisions, we deny the petitions for review and grant the Board's cross-applications for enforcement of its orders.

## I. Background

### A. Facts

OHL is a third-party logistics company that provides transportation, warehousing, and supply-chain management services for other companies. It operates warehouses throughout the country, including five in Memphis, Tennessee. In May 2009, the Union began organizing employees at OHL's Memphis warehouses and, later that year, filed an election petition with the Board to represent those workers. *See Hooks ex rel. NLRB v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1035-36 (W.D. Tenn. 2011). The Union lost the ensuing representation election in March 2010 and filed charges against OHL, alleging that the Company committed multiple unfair labor practices during the unionization campaign. *Id.* at 1035-39. The Board found merit to those allegations and concluded in two separate decisions that, between June 2009 and March 2010, OHL

violated the Act by threatening employees, confiscating union materials, and disciplining union supporters. *See Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632 (2011) (*Ozburn I*) (finding that OHL committed unfair labor practices between June and October 2009), *enforced mem.*, 609 F. App'x 656 (D.C. Cir. 2015) (per curiam judgment); *Ozburn-Hessey Logistics, LLC*, 357 NLRB 1456 (2011) (*Ozburn II*) (finding that Company committed unfair labor practices between November 2009 and March 2010), *enforced mem.*, 605 F. App'x 1 (D.C. Cir. 2015) (per curiam judgment).[1]

The Company's challenged misconduct did not end there, however. Just a few months after the election, OHL disciplined employees Jennifer Smith and Carolyn Jones, on the basis of their union-related conduct. On June 9, 2011, the Company issued a final warning to Smith, a known union leader who distributed union literature and handbills, solicited coworkers to support the Union, and openly wore union hats and shirts to work. The final warning accused Smith of violating OHL's anti-harassment and non-discrimination policy by calling Stacey Williams, a fellow African-American, a racial slur on June 8 during a heated argument about certain office supplies. Final Employee Warning Notice, 14 J.A. 717. Smith denied having made the derogatory remark and refused to sign the final warning.

A few days later, on June 14, the Company fired Jones, a known union leader who distributed union handbills and organizing materials, solicited coworkers to support the Union, and routinely attended union meetings. The

---

[1] While these cases were awaiting Board review, the Union sought, and a federal district court granted, a temporary injunction prohibiting OHL from committing further unfair labor practices and ordering the Company to make whole several unlawfully disciplined employees. *See Hooks*, 775 F. Supp. 2d at 1034, 1053.

Company's termination letter gave two reasons for Jones's discharge. First, the Company accused Jones of violating the Company's "guidelines regarding failure to cooperate with an internal investigation" by fabricating a witness statement about a heated verbal exchange that occurred on May 26, 2011. *See* Jones Termination Letter, 14 J.A. 558. On that day, Jones had attended a meeting during which OHL management disseminated information to employees about union dues. Afterward, Jones went to a break room and told her coworkers that the President supported their right to unionize and that it was "stupid" for employees not to want a union. ALJ Decision of May 15, 2012, 14 J.A. 740-41. According to Jones, OHL Director of Operations Phil Smith suddenly appeared behind her and said, "[I] just had two . . . employees . . . sa[y] they were called stupid. . . . Well, you all are the ones that are stupid because you're trying to get a union in here." Hearing Transcript, 14 J.A. 25. Jones asked if Phil Smith was referring to her, to which he replied, "[i]f the shoe fits, then you wear it." *Id.* When Jones explained to Phil Smith that she did not call anybody "stupid" and tried to end their conversation, *id.* at 26, Phil Smith warned her, "you better watch your back," *id.* at 26-27.

Jones soon prepared a witness statement documenting her encounter with Phil Smith and asked her coworkers to sign it. Four OHL employees signed the statement, which Jones then submitted to OHL's Human Resources Department. After investigating the incident, OHL determined that Phil Smith was innocent of any wrongdoing and that Jones had asked her coworkers to sign a blank sheet of paper before she filled in the witness statement about Phil Smith's threatening comment—conduct the Company characterized as fraudulent.

Second, the Company claimed that Jones was fired because she violated the Company's Anti-Harassment Policy

by repeatedly calling fellow employee Lee Smith a racial epithet. Jones began calling Lee Smith that epithet in the spring of 2011, shortly after he had voiced his opposition to the Union. OHL conducted an internal investigation and concluded that, despite her repeated denials, Jones in fact had used the racial epithet on multiple occasions.

On June 14, 2011, the same day as Jones's discharge, the Union petitioned the Board for a second election to represent workers at OHL's Memphis warehouses. The Board held the representation election on July 27, pursuant to a Stipulated Election Agreement between OHL and the Union. The parties agreed that "office clerical and professional employees" would be excluded from the voting unit and further stipulated that two administrative assistants would vote subject to challenge by the Union. The Union won the election by a vote of 165 to 164. The election tally reflected fourteen ballot challenges, including the Company's challenge to Jones's ballot and the Union's challenge to ballots of the two administrative assistants. OHL and the Union thereafter each objected to the second election on several grounds.

### B. Decisions Below

#### 1. The Unfair Labor Practice Case

Between June and September 2011, the Union filed a series of unfair labor practice charges against OHL challenging the Company's conduct during the months preceding the second representation election, including its punishment of Jennifer Smith and Carolyn Jones. Based on the Union's charges, the Acting General Counsel issued a consolidated complaint alleging, among other things, that the Company disciplined Smith and Jones on account of their

union-related conduct and support in violation of section 8(a)(3) and (1) of the Act.

On May 15, 2012, the Administrative Law Judge determined that OHL had committed the charged unfair labor practices. As relevant here, the ALJ found that, based on hearing testimony and other evidence, the Company violated section 8(a)(3) of the Act by issuing a final warning to Jennifer Smith and terminating Carolyn Jones because of their pro-union activities and views.[2] Applying the Board's two-part analysis from *Wright Line*, 251 NLRB 1083 (1980), the ALJ determined that anti-union animus motivated the Company's punishment of Smith and Jones and that the Company's putative justifications for meting out those disciplinary measures were pretextual. Because the Company's proffered reasons for disciplining Smith and Jones were "mere pretext[s]," ALJ Decision of May 15, 2012, 14 J.A. 746, the ALJ explained, it "fail[ed] by definition to show that it would have taken the same [disciplinary] action for those reasons, absent the protected conduct," *id.* (quoting *Rood Trucking Co.*, 342 NLRB 895, 898 (2004)). The ALJ therefore directed the Company to post an appropriate remedial notice regarding its violations of the Act and imposed three additional remedies. The ALJ ordered OHL (1) to distribute electronically the remedial notice to all unit employees; (2) to have the notice read aloud to the Memphis employees by a Board representative in the presence of two designated OHL managers; and (3) to cease and desist from committing the charged unfair labor practices and from otherwise violating the Act.

---

[2] The ALJ also found that the Company violated section 8(a)(1) by threatening and interrogating employees, surveilling employees, creating the impression of surveillance, confiscating union materials, and telling pro-union employees to resign.

In the same decision, the ALJ resolved the pending ballot challenges and objections arising from the second representation election. After ruling on the parties' electoral disputes largely in the Union's favor, the ALJ issued a recommended order to count six of the remaining ten challenged ballots. The ALJ further recommended that, if the Union did not prevail after those six votes were counted, the Regional Director should invalidate the second election so OHL employees could vote in a third, untainted election.

On May 2, 2013, the Board affirmed the ALJ's rulings, findings, and conclusions, rejected all of OHL's exceptions to the ALJ's decision, and adopted the ALJ's remedial order, with one modification.[3] *Ozburn-Hessey Logistics, LLC*, 359 NLRB No. 109, at *1-4 & n.2 (2013) (*Ozburn III*). The Board "agree[d]" with the ALJ's findings that OHL "discharged employee Carolyn Jones for engaging in protected activity" and "unlawfully issued employee Jennifer Smith a written final warning in retaliation for her prounion activity." *Id.* at *1-2. "[A]dditional circumstances," the Board emphasized, supported the ALJ's conclusion that Jennifer Smith's discipline was unlawful. *Id.* at *2. The Board found that, based on the credited evidence, OHL's "purported belief that Smith used a racial slur was not reasonable." *Id.* The Board also determined that OHL "was highly inconsistent in its response to racial slurs," noting that the Company readily applied its Anti-Harassment Policy against pro-union employees Jones and Smith, while overlooking grossly offensive statements by OHL supervisor Phil Smith. *Id.* That uneven treatment, the Board concluded,

---

[3] The Board's amended remedy afforded OHL the option to have its own managers read the notice aloud to employees in the presence of a Board representative.

suggested that OHL "was using its antiharassment policy to target union supporters, further corroborating the [ALJ's] finding of pretext." *Id.* Finally, the Board adopted the ALJ's resolution of the parties' election objections and ballot challenges and thus directed the Regional Director to count six of the challenged ballots. *Id.* at *3-5. OHL petitioned for review of the Board's May 2013 Decision.

In compliance with the Board's May 2013 Decision, the Regional Director issued a revised election tally of 169-166 in the Union's favor and, on May 24, 2013, certified the Union as the exclusive bargaining representative for the designated employee unit. In June 2013, OHL refused the Union's request to bargain, prompting the Union to file charges under the Act. Pursuant to those charges, the Acting General Counsel filed a complaint alleging that OHL's refusal to bargain with the Union violated section 8(a)(5) and (1) of the Act.

The following year, the Supreme Court decided *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), which invalidated the appointments of two Board members on the panel that had issued the Board's May 2013 Decision on the unfair labor charges. On June 27, 2014, the Board set aside that decision in light of *Noel Canning* and retained the case on its docket.

On November 17, 2014, upon *de novo* review of the ALJ's decision, a lawfully constituted panel of the Board affirmed the ALJ's rulings, findings, and conclusions and adopted with modification the recommended remedial order "to the extent and for the reasons stated" in its May 2013 Decision, which the Board expressly incorporated by reference. *Ozburn-Hessey Logistics, LLC*, 361 NLRB No. 100, at *1 (2014) (*Ozburn IV*). Although the Board found that the Regional Director lawfully certified the Union based

on an accurate, revised tally of the representation election, it nevertheless issued a new Certification of Representative "in an abundance of caution." *Id.* at *1. Shortly thereafter, OHL petitioned for review of the Board's November 2014 Decision, and the Board cross-applied for enforcement of the same. The two unfair-labor-practice cases were consolidated, and the Union intervened.

## 2. The Refusal To Bargain Case

Meanwhile, in December 2014, the Union sent another letter to OHL requesting that the Company bargain, and OHL once more refused. The following month, with the Board's permission, the General Counsel amended its complaint to allege that the Company in 2014 had again refused to bargain in violation of section 8(a)(5) and (1) of the Act. OHL admitted that it had refused to bargain with the Union, but asserted that it was not obligated to do so because the Board had erred in resolving the ballot challenges, overruling the Company's election objections, and certifying the Union. OHL also sought dismissal of the General Counsel's complaint on the ground that the Union never filed a new charge following the Board's 2014 Certification of Representative.

On June 15, 2015, the Board issued a Decision and Order finding that OHL's refusal to bargain with the Union was unlawful under section 8(a)(5) and (1) of the Act. *See Ozburn-Hessey Logistics, LLC*, 362 NLRB No. 118, at *1-5 (2015) (*Ozburn V*). The Board rejected the Company's efforts to relitigate the ballot challenges and election objections previously adjudicated in the Board's November 2014 Decision and found no merit to the Company's contention that the General Counsel's amended complaint was procedurally infirm for want of a separately filed charge

after the Board certified the Union in 2014. *See id.* at \*2. OHL petitioned for review of the Board's 2015 Decision, and the Board cross-applied for enforcement. The two refusal-to-bargain cases were consolidated, and the Union intervened.

After briefing was completed, we granted the Company's request to consolidate the refusal-to-bargain cases with the unfair-labor-practice cases. We have jurisdiction over the consolidated appeals under 29 U.S.C. § 160(e) and (f).

## II. Analysis

### A. Standard of Review

We "accord[] a very high degree of deference to administrative adjudications by the [Board]" and reverse its findings "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (internal quotation marks omitted). Under that very deferential standard, we "must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 646-47 (D.C. Cir. 2013) (quoting *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011)). We also "owe substantial deference to inferences drawn by the Board from the factual record," *Tenneco*, 716 F.3d at 647 (internal quotation marks omitted), and "[o]ur review of the Board's conclusion as to discriminatory motive is even more deferential, because most evidence of motive is circumstantial," *Fort Dearborn Co. v. NLRB*, --- F.3d ---, 2016 WL 3361476, at \*3 (D.C. Cir. Apr. 12, 2016) (reissued June 17, 2016) (internal quotation marks

omitted); *see also Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005). Furthermore, we "will uphold the Board's adoption of an ALJ's credibility determinations unless those determinations are hopelessly incredible, self-contradictory, or patently unsupportable." *United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004) (internal quotation marks omitted).

### B. Section 8(a)(3) Violations

OHL first challenges the Board's determination that it violated section 8(a)(3) and (1) of the Act by issuing a final warning to Jennifer Smith and terminating Carolyn Jones on account of their union-related activity.

Under section 8(a)(3), it is "an unfair labor practice for an employer . . . to encourage or discourage membership in any labor organization" by "discriminati[ng] in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3). An employer violates section 8(a)(3) "by taking an adverse employment action, such as issuing a disciplinary warning, in order to discourage union activity." *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125 (D.C. Cir. 2001); *see Fort Dearborn*, 2016 WL 3361476, at *3. And an employer that violates section 8(a)(3) derivatively violates section 8(a)(1)'s prohibition on "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section [7 of the Act]," 29 U.S.C. § 158(a)(1). *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

Where, as here, an employer purports to have disciplined or discharged an employee for reasons unrelated to protected union activity, the Board applies the so-called *Wright Line* test. *Fort Dearborn*, 2016 WL 3361476, at *3; *Shamrock*

*Foods Co. v. NLRB*, 346 F.3d 1130, 1135 (D.C. Cir. 2003). Under that test, the General Counsel "must first make a prima facie showing sufficient to support the inference that protected [i.e., union-related] conduct was a motivating factor in the . . . adverse action." *Tasty Baking*, 254 F.3d at 125 (alteration and omission in original) (internal quotation marks omitted). "Relevant factors" in determining an employer's motive "include 'the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action.'" *Fort Dearborn*, 2016 WL 3361476, at *3 (quoting *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 735 (D.C. Cir. 2000)); *see Fortuna Enters., LP v. NLRB*, 665 F.3d 1295, 1303 (D.C. Cir. 2011). "Once a prima facie case has been established, the burden shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Tasty Baking*, 254 F.3d at 126.

OHL does not seriously dispute the Board's conclusion that the General Counsel met his initial burden, at the first step of the *Wright Line* analysis, to show that union animus motivated the Company's decisions to issue a warning to Jennifer Smith and discharge Carolyn Jones. Nor could it. Substantial evidence in the record supports the Board's findings that Smith and Jones were active supporters of the Union, that OHL had knowledge of their union-related conduct, and that OHL harbored animus toward the Union and its supporters. *See Fort Dearborn*, 2016 WL 3361476, at *3; *Power Inc. v. NLRB*, 40 F.3d 409, 418 (D.C. Cir. 1994).

OHL instead contends that the Board misapplied the *Wright Line* test by denying the Company a meaningful opportunity to show, at the second step of the *Wright Line* analysis, that it would have issued a final warning to Smith and discharged Jones even in the absence of the allegedly

unlawful motive. The Board further erred, OHL claims, by concluding arbitrarily and without any basis in the record that the Company's proffered justifications for disciplining Smith and discharging Jones were pretextual.

### 1. The Board's Application of the *Wright Line* Test

We first consider OHL's argument that the Board erred by affirming what OHL characterized as the ALJ's misapplication of the *Wright Line* test. According to OHL, the ALJ sidestepped the full *Wright Line* analysis by concluding that, "[i]f the employer's proffered defenses are found to be a pretext, i.e., the reasons given for its actions are either false or not, in fact, relied on, the employer fails by definition to show that it would have taken the same action for those reasons," rendering it unnecessary "to perform the second part of the *Wright Line* analysis." ALJ Decision of May 15, 2012, 14 J.A. 746. OHL argues that the ALJ's approach, which the Board subsequently affirmed and adopted, impermissibly skipped over the second step of *Wright Line* and thus abridged the Company's opportunity to rebut the General Counsel's *prima facie* showing that it disciplined Smith and Jones for unlawful reasons.

Neither the ALJ nor the Board deviated from the analytical approach set forth in *Wright Line*. Applying that test, the ALJ determined that the Company's decisions to punish Smith and Jones were motivated by anti-union animus and rejected each of the reasons the Company claimed to have relied on in taking those disciplinary actions. In doing so, the ALJ did not, as OHL contends, deny it the opportunity to present its affirmative defenses: the ALJ allowed the Company to advance its defenses but, after considering them in light of the record, concluded that they were "mere pretext[s]." ALJ Decision of May 15, 2012, 14 J.A. 746.

Nothing in *Wright Line* forecloses that approach and, indeed, the Board's precedent interpreting and applying *Wright Line* expressly authorizes it. In *Rood Trucking*, for example, the Board clarified that:

> [a] finding of pretext defeats any attempt by the [company] to show that it would have discharged the discriminate[e]s absent their union activities . . . because where "the evidence establishes that the reasons given for the [company's] action are pretextual—that is, either false or not in fact relied upon—the [company] fails by definition to show that it would have taken the same action for those reasons, absent the protected conduct, and thus there is no need to perform the second part of the *Wright Line* analysis.

342 NLRB at 898 (quoting *Golden State Foods Corp.*, 340 NLRB 382, 385 (2003)); *see also Limestone Apparel Corp.*, 255 NLRB 722 (1981) ("[W]here an administrative law judge has evaluated the employer's explanation for its action and concluded that the reasons advanced by the employer were pretextual, that determination constitutes a finding that the reasons advanced by the employer either did not exist or were not in fact relied upon."). Accordingly, the ALJ's articulation of the legal standard comported with the Board's guidance in *Rood Trucking*.

The Company insists that even if *Rood Trucking* countenances the ALJ's approach here, that decision "contravenes *Wright Line*" by "preclud[ing] the burden from ever shifting" to the Company, resulting in the Board "mak[ing] a premature declaration of pretext without ever considering the employer's justification for the disciplinary

decision." 14 Petitioner's Reply Br. 15-16. To the extent that OHL asserts that the ALJ failed to consider the Company's defenses, it has mischaracterized the ALJ's decision, which considered OHL's proffered reasons and found them to be pretextual. To the extent that OHL claims legal error, we decline its invitation to overturn *Rood Trucking*. To begin, that decision constitutes the Board's well-reasoned "interpretation of its own precedent" in *Wright Line* and therefore "is entitled to deference." *Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006) (internal quotation marks omitted). Even absent such deference, however, we perceive no conflict between *Rood Trucking* and the *Wright Line* test.

To be sure, *Wright Line* dictates that an employer may rebut the General Counsel's initial showing of union animus by establishing that it "would have taken the same [adverse] action [against the employee] in the absence of" the unlawful motive. 251 NLRB at 1091. *Rood Trucking*'s logic is not to the contrary. If the Board concludes, as it did here, that the employer's purported justifications for adverse action against an employee are pretextual, then the employer fails as a matter of law to carry its burden at the second prong of *Wright Line*. *See Rood Trucking*, 342 NLRB at 898. Indeed, the Board has articulated the *Wright Line* framework in similar, if not identical, terms in numerous decisions both before and since *Rood Trucking*. *See, e.g.*, *Ozburn II*, 357 NLRB at 1456 n.3 ("We agree with the judge that the [Company's] proffered reason for terminating [the employee] was shown to be pretextual, and that the [Company] therefore failed to rebut the Acting General Counsel's initial case by showing it would have terminated [the employee] in the absence of her union support."); *U-Haul of Cal.*, 347 NLRB 375, 388-89 (2006), *enforced mem.*, 255 F. App'x 527 (D.C. Cir. 2007) (judgment); *Golden State Foods*, 340 NLRB at 385; *In re Sanderson Farms, Inc.*, 340 NLRB 402, 402

(2003). Courts, too, have formulated the *Wright Line* burden-shifting test consistently with both *Rood Trucking* and the ALJ's decision here. *See, e.g.*, *USF Red Star, Inc. v. NLRB*, 230 F.3d 102, 106 (4th Cir. 2000) ("If the Board believes the employer's stated lawful reasons are non-existent or pretextual, the [employer's affirmative] defense fails."); *cf. NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 398 (1983), *abrogated on other grounds by Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267 (1994). Because the ALJ correctly adhered to the Board's decisions in *Wright Line* and *Rood Trucking*, the Board did not err in affirming and adopting the ALJ's articulation of the controlling legal standard.

### 2. Final Warning of Jennifer Smith

We next turn to OHL's contention that the Board arbitrarily found that the Company's asserted justification for issuing a final warning to Jennifer Smith—namely, that she violated OHL's Anti-Harassment Policy by calling her coworker Stacey Williams a racial slur—"was a mere pretext." ALJ Decision of May 15, 2012, 14 J.A. 746. That challenge misses the mark.

The ALJ determined, and the Board agreed, that Smith never used that racial epithet. In reaching that determination, the ALJ credited Smith's testimony that she never called Williams any such name because he "found her to be an honest [and cooperative] witness." *Id.* at 741. Smith's account, the ALJ emphasized, was consistent with the accounts of other credible witnesses who observed the altercation. Jennifer Smith's co-worker, Jerry Smith, testified that he would have heard the racial slur if Smith had actually said it because he was "focused enough on what was going on," but that he did not hear it. Testimony of Jerry Smith, 14

J.A. 266-67. Likewise, Sheila Childress, a co-worker who witnessed the altercation from about thirty feet away, stated that she did not hear Smith utter the epithet. The ALJ expressly discredited Stacey Williams's testimony that Jennifer Smith addressed him with a racial slur because he "was a confusing, hostile, and argumentative witness," whose testimony was "disjointed." ALJ Decision of May 15, 2012, 14 J.A. 741. The ALJ also found that OHL employee Shirley Milan, who corroborated Williams's account of events, was "a biased witness, who previously made an unsubstantiated claim that Smith threatened her with a knife, and who also conceded that she dislikes Smith." *Id.* We decline to disturb the Board's adoption of those credibility findings, which rest on substantial record support and are certainly not reversible as "hopelessly incredible, self-contradictory, or patently unsupportable." *United Servs. Auto. Ass'n*, 387 F.3d at 913 (internal quotation marks omitted); *see Monmouth Care Ctr. v. NLRB*, 672 F.3d 1085, 1091-92 (D.C. Cir. 2012) (declining to overturn administrative law judge's credibility determination "based on a combination of testimonial demeanor and a lack of specificity and internal corroboration").

OHL nevertheless maintains that, even accepting the Board's factual finding that Jennifer Smith did not use a racial slur against Stacey Williams, OHL reasonably believed that she did based on the evidence at its disposal, and punished her accordingly. Its reasonable belief, OHL claims, was sufficient to rebut the General Counsel's *prima facie* case of anti-union motive at the second prong of the *Wright Line* analysis. In support of that contention, OHL invokes our decision in *Sutter East Bay Hospitals v. NLRB*, 687 F.3d 424 (D.C. Cir. 2012), where we held that "[i]f [a company's] management reasonably believed [the employee's] actions occurred, and the disciplinary actions taken were consistent

with the company's policies and practice, then [a company] could meet its burden under *Wright Line* regardless of what actually happened." *Id.* at 435-36; *see also Fort Dearborn*, 2016 WL 3361476, at \*6.

*Sutter East Bay* is of little aid to OHL because, as the Board concluded, "the record establishes that [OHL's] *purported* belief that Smith used a racial slur was *not reasonable*." *Ozburn III*, 359 NLRB No. 109 at \*2 (emphasis added), *incorporated by reference in Ozburn IV*, 361 NLRB No. 100. The Board found that the credited testimony of Jennifer Smith, Childress, and Jerry Smith, outlined above, severely undercut the reasonableness of the Company's belief, which was based on the accounts of biased and incredible witnesses. *Id.* In fact, the day before the Company issued Jennifer Smith the final warning, Childress furnished to the Company a signed statement explaining that she did not hear Smith use any racial epithet during the verbal altercation with Williams, giving the Company a significant reason to doubt Williams's allegation.

The Board also determined that "credited evidence in the record" established "that [OHL] did not believe that the use of racial slurs merited discipline." *Id.* Most tellingly, that record evidence showed that OHL supervisor Phil Smith was not disciplined at all after hurling highly offensive racial and homophobic slurs at employees in front of other managers and employees. And several other witnesses testified that use of racial slurs was commonplace among the workers at OHL's Memphis warehouses. Based on that and other credited record evidence, the Board reasonably inferred that OHL acted "inconsistent[ly] in its response to racial slurs" and "was using its antiharassment policy to target union supporters." *Ozburn III*, 359 NLRB No. 109 at \*2; *see also infra* 23-25. Consequently, the Company cannot avail itself

of *Sutter East Bay*'s safe harbor, because, as the Board found, it has not shown that it reasonably believed Jennifer Smith used a racial epithet or that "it parceled out discipline as it normally would when confronted with the same kind of employee misconduct that its managers reasonably believed had occurred." *See Fort Dearborn*, 2016 WL 3361476, at *6. The Board reasonably concluded, consistent with the evidence, that, "even assuming [OHL] reasonably believed that Smith had used a racial epithet," the Company "could not and did not establish that it would have disciplined her in the absence of the union activity." *Ozburn III*, 359 NLRB No. 109 at *2. We owe heightened deference to that well-reasoned assessment of the Company's discriminatory motive and find no basis in the law or record to question the Board's determination that OHL's proffered reason for disciplining Smith was mere pretext. *See Fort Dearborn*, 2016 WL 3361476, at *3.

In sum, substantial evidence supports the Board's findings that Smith never used the alleged racial slur and that it was unreasonable for the Company to believe that she did. We therefore deny OHL's petition for review, and grant the Board's cross-application for enforcement, of the Board's decision that OHL's discipline of Smith violated section 8(a)(3) and (1) of the Act.

### 3. Discharge of Jones

OHL also challenges the Board's determination that the Company's two putative justifications for terminating Jones were pretextual. OHL maintains that it fired Carolyn Jones for two legitimate reasons unrelated to her union support and activity: (1) she violated the Company's conduct guidelines by fabricating a witness statement that supervisor Phil Smith threatened her with the warning, "watch your back"; and (2)

she violated the Company's Anti-Harassment Policy by repeatedly using a racial slur against co-worker Lee Smith. The Board found those reasons to be pretextual. We affirm that finding.

### a. Discharge Reason # 1: OHL Claims Jones Fabricated Her Witness Statement

Substantial evidence supports the Board's conclusion that Carolyn Jones did not fabricate her witness statement regarding Phil Smith's alleged threat. All four witnesses who signed the statement—Annie Ingram, Troy Hughlett, James Bailey, and Kedric Smith—confirmed that they heard Phil Smith tell Jones that she had better watch her back. And at least two of those witnesses, Ingram and Hughlett, credibly testified that the witness statement prepared by Jones had some text on it before they had signed it, undercutting the Company's suggestion that Jones prepared the witness statement only after obtaining the signatures. Kedric Smith testified that Jones handed him a blank page to sign, but the Board discounted that testimony because it found he had poor recall of the pertinent issues. We decline to overturn the Board's well-reasoned credibility findings, which rested on a comparison of "testimonial demeanor," "specificity," and "internal corroboration." *Monmouth Care Ctr.*, 672 F.3d at 1091-92. The Board thus reasonably concluded, based on the credible evidence, that Jones did not fraudulently manufacture her witness statement.

Relying once more on our precedent in *Sutter East Bay*, 687 F.3d at 435-36, OHL insists that it reasonably believed that Jones falsified her statement because all four witnesses who signed her statement had given written statements confirming that Jones handed them a blank page to sign. But the Board concluded, based on the credible testimony of

Ingram, Hughlett, and Bailey, that OHL pressured or deceived at least the three of them into signing false written statements to that effect. Ingram testified that that Human Resources Manager Evangelia Young interviewed her, gave her a blank piece of paper to sign, and subsequently added false text about Jones—notably, the very actions of which OHL accuses Jones. Bailey testified that Young asked him to sign a prepared statement confirming that Jones had given Bailey a blank witness statement to sign. Although Bailey admits to signing Young's prepared statement, he testified that he did not closely inspect the document because he assumed Young was accurately writing "down what [he] said," and that he simply signed it because management's "constant[]" questioning about the incident "stressed [him] out." Testimony of James Bailey, 14 J.A. 139-41. Hughlett testified that he signed a statement, prepared by Young, declaring that Jones's witness statement was blank when he signed it, but he testified that he did so only because he did not want to be questioned any more about the incident and felt "pressure[d]" by management to sign the statement. Testimony of Troy Hughlett, 14 J.A. 98. Given the ample testimony suggesting that OHL itself manufactured evidence to justify Jones's termination, the Board had a sound basis for concluding that OHL could not reasonably have believed that Jones fabricated her witness statement. *See Fort Dearborn*, 2016 WL 3361476, at *6 (noting that, to rebut *prima facie* case of anti-union motive, employer must show that it "reasonably believed" that misconduct "had occurred"). Substantial evidence in the record supports the Board's determination that OHL's first reason for firing Carolyn Jones was pretextual.

### b. Discharge Reason # 2:  OHL Claims Jones Repeatedly Used a Racial Slur

We reach the same result with respect to the Company's second putative reason for Jones's termination—her ostensible use of a racial slur against her coworker Lee Smith. Although the Board determined that Carolyn Jones did in fact use that epithet, it rejected as pretextual OHL's assertion that Jones was fired for that reason.  The Board found that OHL punished Jones's infraction far more severely than prior, similar infractions by other employees.  It pointed in particular to the Company's willingness to overlook racist and other offensive statements made by supervisor Phil Smith, which the Board found inconsistent with OHL's decision to fire Jones.  The Board further concluded that OHL's termination of Jones deviated from the Company's progressive disciplinary policy, which sets forth lesser initial penalties for violations like hers.  Based on those findings, the Board concluded that the Company would not have discharged Jones based on her use of a racial slur absent her union-related activity.  Substantial evidence supports that conclusion.

The record evidence confirms that OHL's punishment of Jones was far more severe than the discipline the Company imposed on other, similar offenders.  As the Board explained, in ten prior disciplinary actions involving racial epithets or other profane language, OHL issued eight warnings, one suspension arising from recidivism, and one discharge arising from recidivism and a connected assault.  The only other employee who was discharged, Ashley Burgess, was a repeat offender who received a verbal warning for using profanity against a supervisor in January 2006 and was fired after hurling racial slurs at another employee during a heated physical confrontation in September 2010.  Unlike Burgess,

Jones was not a recidivist, did not assault, threaten, or otherwise physically confront anyone at work, and had never before been reported for using vulgar or offensive language. In addition, OHL's willingness to turn a blind eye to the racial slurs and offensive remarks of OHL supervisor Phil Smith further underscores the unusual harshness of OHL's discipline of Jones. As explained above, Phil Smith called an African American worker a racial slur and another employee a homophobic epithet. Unlike Jones, who received OHL's harshest punishment, however, OHL did not punish Phil Smith at all.

OHL argues that the disciplinary cases evaluated by the Board involved employees who committed different offenses or were otherwise not comparably situated to Jones. But even if none of those cases involved the exact circumstances or the same racial epithets involved in Jones's case, the Board deemed them materially similar and held that they demonstrated that no other employee who had engaged in only verbal misconduct received as severe a punishment for an initial infraction as she did. The evidence provides substantial support for the Board's findings that OHL engaged in disparate treatment of Jones and that its stated justification was mere pretext. *See, e.g.*, *Southwire Co. v. NLRB*, 820 F.2d 453, 460 (D.C. Cir. 1987) (holding that absence of evidence that employer discharged any other employee for similar violation supported finding of pretext); *La Gloria Oil & Gas Co.*, 337 NLRB 1120, 1124 (2002) (observing that disparate treatment of employees demonstrates pretext).

The record evidence likewise supports the Board's determination that OHL's termination of Jones deviated from the Company's progressive disciplinary system. The Company's Handbook identifies four forms of discipline, the most severe of which is termination. Under the Handbook,

termination may be warranted "[i]n cases in which [less severe] disciplinary action has failed to correct unacceptable behavior or performance, or in which the performance issue is so severe as to make continued employment with OHL undesirable." OHL Handbook, 14 J.A. 649. The Company emphasizes that OHL retains discretion under the Handbook to "apply any level of discipline . . . without resort to prior disciplinary steps." *Id.* at 646. The Handbook makes equally clear, however, that discipline "will generally be administered at the lowest level of severity which will effect correction of the problem." *Id.* at 649. Rather than adhere to its general disciplinary norm of starting out with the least severe penalty that might accomplish the disciplinary objective, the Company chose immediately to impose the harshest form of discipline on Jones for her remarks, even though she was not a recidivist and had not engaged in any violent conduct. Accordingly, substantial evidence supports the conclusion that the Company deviated from its progressive disciplinary procedure, thus bolstering the Board's finding of pretext. *See Fort Dearborn*, 2016 WL 3361476, at *5 (concluding that failure to apply progressive disciplinary policy without explanation supports a finding of pretext).

Because substantial evidence supports the Board's determination that OHL's proffered reasons for firing Jones were pretextual, and because its decision is not otherwise arbitrary or unlawful, we deny the Company's petition for review, and grant the Board's cross-application for enforcement, of the Board's decision that OHL's termination of Jones violated section 8(a)(3) and (1) of the Act.

## C. The Company's Remaining Challenges

OHL challenges the Board's decisions on several additional grounds. It contends that the Board's

determinations that the Company committed numerous section 8(a)(1) violations were unsupported by substantial evidence or otherwise erroneous; that the Board abused its discretion by imposing three additional remedies;[4] and that the Board denied OHL due process by affirming the decision of an ALJ whom OHL believes harbors pro-union bias. The Board then compounded those errors, OHL argues, by mistakenly counting Carolyn Jones's vote in the second representation election, failing to count the votes of two administrative assistants, rejecting OHL's election objections, and ruling on an amended complaint in the absence of an amended unfair labor practice charge. After carefully reviewing the Company's remaining arguments in light of the record and applicable legal authority, we conclude that they lack merit and warrant no further discussion. *See United States v. McKeever*, --- F.3d ---, 2016 WL 3213035, at \*13 (D.C. Cir. June 10, 2016). Accordingly, "we grant without amplification the Board's cross-application for enforcement" as to the remaining findings challenged by the Company. *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1251 (D.C. Cir. 2012); *see also Tenneco*, 716 F.3d at 647-48.

---

[4] We lack jurisdiction to consider OHL's challenges to two of the Board's remedies—the cease-and-desist order and the electronic distribution requirement—because the Company did not object to those remedies before the Board. *See* 29 U.S.C. § 160(e); *Nova Se. Univ. v. NLRB*, 807 F.3d 308, 313 (D.C. Cir. 2015); *W&M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008).

\* \* \*

For the foregoing reasons, we deny the Company's petitions for review and grant the Board's cross-applications for enforcement.

*So ordered.*