RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0250p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

OZBURN-HESSEY LOGISTICS, LLC, dba Geodis Logistics, LLC,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*,

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,

*Intervenor*.

Nos. 18-2103/2217

On Petition for Review and Cross Application for Enforcement
of an Order of the National Labor Relations Board;
No. 15-CA-165554.

Argued: August 7, 2019

Decided and Filed: September 24, 2019

Before: SUTTON, GRIFFIN, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Benjamin H. Bodzy, GEODIS LOGISTICS, INC., Nashville, Tennessee, for Petitioner/Cross-Respondent. Steven A. Bieszczat, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Benjamin H. Bodzy, GEODIS LOGISTICS, INC., Nashville, Tennessee, Stephen D. Goodwin, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Memphis, Tennessee, for Petitioner/Cross-Respondent. Steven A. Bieszczat, Elizabeth A. Heaney, David Habenstreit, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Keren Wheeler, UNITED STEELWORKERS, Pittsburgh, Pennsylvania, for Intervenor.

—————————

**OPINION**

—————————

GRIFFIN, Circuit Judge.

Petitioner Ozburn-Hessey Logistics, LLC ("OHL") and the National Labor Relations Board ("NLRB" or "Board") have what can only be described as "a long and acrimonious history," during which OHL has engaged in a multitude of unfair labor practices and anti-union activity. *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 336 (6th Cir. 2017). In this latest dispute, the Board found that OHL violated the National Labor Relations Act ("NLRA") when it unilaterally changed its employee attendance policy two separate times—without giving the union that represents its employees notice and the opportunity to bargain—and then discharged an employee pursuant to the new policy. OHL challenges the Board's finding with respect to the second violation on due process grounds, arguing that it was neither specifically alleged in the administrative complaint nor tried at the hearing before an administrative law judge ("ALJ"). OHL also contends that the change to the attendance policy did not cause the employee's discharge. The Board opposes the petition and has filed a cross-petition for enforcement of its order.

We conclude that the Board did not deprive OHL of due process. While OHL is correct that the second violation was not specifically alleged in the charge or the complaint, the record is replete with evidence that the Board provided ample notice to OHL, and the parties thoroughly litigated the issue at the hearing. OHL's causation argument fails as a result of this conclusion. Accordingly, we deny OHL's petition and grant the Board's cross-petition for enforcement.

I.

A.

"OHL is a third-party logistics company that provides transportation, warehousing, and supply-chain management services for other companies. It operates warehouses throughout the country, including five in Memphis, Tennessee." *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 213 (D.C. Cir. 2016). In 2009, the United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the Union") began efforts to organize OHL's workers there. *Id.* at 212. "That campaign culminated in a July 27, 2011, representation election, which the Union won by a one-vote margin." *Id.* In the months leading up to that election, OHL violated the NLRA "by threatening, interrogating, and surveilling employees; creating the impression of such surveillance; confiscating union-related materials; urging union supporters to resign; and disciplining two employees because of their pro-union views." *Id.* at 212–13; *see Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632 (2011), *enforced*, 609 F. App'x 656 (D.C. Cir. 2015) (per curiam); *Ozburn-Hessey Logistics, LLC*, 357 NLRB 1456 (2011), *enforced mem.*, 605 F. App'x 1 (D.C. Cir. 2015) (per curiam). OHL also unsuccessfully disputed the results of the representation election—twice. *Ozburn-Hessey*, 833 F.3d at 216; *see Ozburn-Hessey Logistics, LLC*, 362 NLRB 977 (2015); *Ozburn-Hessey Logistics, LLC*, 361 NLRB 921 (2014), *enforced*, 833 F.3d 210.

After the election disputes were resolved and "the Board's Regional Director certified the Union as the exclusive bargaining representative for [OHL]'s Memphis employees," OHL repeatedly refused to bargain with the Union. *Ozburn-Hessey*, 833 F.3d at 213. This prompted another ruling of the Board finding that OHL had again violated the NLRA. *Id.* The Court of Appeals for the D.C. Circuit denied OHL's petitions for review and granted the cross-applications for enforcement with respect to all four relevant orders of the Board. *Id.* at 213, 225.

After the election, but before OHL's challenges to its validity had been resolved, OHL decided to unilaterally change its employee attendance policy, without notifying the Union or attempting to bargain with it. The original policy had been issued in 2008 and revised twice, once later in 2008 and again in 2011. Under the old policy, employees received points for various types of absences from work: four points for a "no call/no show," three for "leaving early," two for an "unexcused absence," and one for an "unexcused late." Employees' attendance records were "evaluated over a 52-week rolling basis," with progressively severe disciplinary measures doled out as their point totals increased. "Thirteen combined points, or two no call/no show occurrences within a 52-week rolling period, w[ould] result in termination."

On October 1, 2013, OHL issued the new attendance policy changing, among other things, the number of points assigned to each attendance infraction.  The new policy included a table describing the new points system:

| Absence | An employee's failure to report to work as scheduled after missing over two hours of the workday. | 2 points |
|---|---|---|
| Late | An employee's late arrival up to two hours from the start of the scheduled shift and/or an employee's late return from breaks or lunch. | 1 point |
| Leave Early | Leaving early from work without the supervisor's approval (including overtime) | 1 point |
| No Call/No Show | Not reporting for work and not calling in for one workday.  A workday is viewed as any day for which an employee is regularly scheduled to work, a scheduled overtime workday, or a day for which the employee is typically off but has volunteered to work (if an employee does not call out or report to work within the first 4 (hours) of their scheduled shift, the day will be treated as a NCNS). | 4 points |

The progressive discipline thresholds remained the same, however, including termination after accruing thirteen points or two no call/no shows.  Thus, regarding "absences," the new policy was more favorable to employees than the old one.  Lisa Johnson, the regional human resources manager for OHL's Memphis facilities, held mandatory meetings with full-time employees, where she announced the changes to the attendance policy, provided written copies, and obtained employees' signed acknowledgements that they had received it.

At some subsequent point, OHL changed its attendance policy again.  A September 2014 email from Lisa Johnson described the modification:  "If the employee works for at least 2 hours, then the employee will receive 1 point for leaving early.  If the employee leaves before working a full 2 hours, then the employee will receive 2 points."  The parties refer to this as the "two-hour rule."

At the administrative hearing, the parties disagreed over when this second change occurred, and the ALJ did not determine a precise date in his factual findings.  But he did specifically reject the contention that the addition of the two-hour rule was contemporaneous with the October 2013 changes to the attendance policy, and the Board similarly found that the second change occurred "[a]t some time after October 2013."  *Ozburn-Hessey*, 366 NLRB No. 173, at *1 (NLRB Aug. 24, 2018); *see id.* at n.1.  Unlike the previous change, "[t]he 2-hour

rule was not incorporated into [OHL's] new written policy, nor did the Respondent notify employees contemporaneously about the change." *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 173, at *1 (NLRB 2018). Moreover, OHL did not provide the Union with prior notice of this change to the attendance policy or an opportunity to bargain over it.

Jermaine Brown began working at OHL as a full-time employee in April 2013 and received a copy of the original attendance policy at that time. During his tenure there, he received several attendance infractions and was disciplined for each one. On July 28 and October 10, 2014, Brown left work after being on the job for under two hours; he received two points for each infraction pursuant to the two-hour rule. Brown objected to these, "point[ing] out that the policy clearly stated one point for leaving early without permission." He raised this concern first with a human resources worker and then with the director of operations, who "responded that the policy did not say two points but that was what it meant." As Brown continued to accrue points for other, subsequent violations of the attendance policy, he maintained his objection to having received two points on each of those two occasions. Eventually, "Brown was terminated for having 13 combined points, including the four points for July 28 and October 10, 2014." Soon after, he contacted the Union, which was unaware of either change to OHL's attendance policy.

B.

The Union filed a charge before the NLRB in December 2015. *See* 29 C.F.R. § 101.2. It alleged that in May or June of 2014, OHL "unilaterally changed its attendance policy without providing the Union with notice and an opportunity to bargain," and that in July of 2015, OHL "discharged Jermaine Brown as a result of its unilaterally changed attendance policy." In March 2016, the General Counsel for the NLRB issued a complaint and notice of hearing containing similar allegations. *See* 29 C.F.R. § 101.8. OHL filed an answer admitting that it had "changed the number of attendance points charged" but denying the other allegations.

A trial-like hearing commenced before ALJ Ira Sandron. *See Ozburn-Hessey Logistics, LLC*, No. 15-CA-165554, 2016 WL 5340241, slip op. at 1 (NLRB Div. of Judges Sept. 22, 2016); *see also* 29 C.F.R. § 101.10. It featured opening statements, examinations of witnesses, and introductions of exhibits. A transcript of the hearing appears in the administrative record.

After the hearing, the ALJ concluded that OHL "violated Section 8(a)(5) and (1) by announcing and changing its attendance policy in mid-October 2013, to wit, changing the points assessed for leaving early, without providing the Union with prior notice or an opportunity to bargain."**[1]** The ALJ also found that Jermaine Brown's discharge was not caused by the changes to the attendance policy. Noting that "[t]he General Counsel alleges only the mid-October 2013 change in attendance points as a violation," the ALJ stated that "[t]he basis for determining whether [OHL's] unilateral action harmed Brown has to be the policy before and after the mid-October 2013 change, not whether any later unilateral modifications of that change worked to his detriment." The ALJ emphasized that regardless of the two-hour rule's implementation, the new attendance policy was still more favorable to Brown than it had been prior to October 2013, when all "leaving early" violations were assigned three points. So either way, "Brown benefitted in that he accrued the 13 points at a later time and thus delayed rather than hastened his discharge."

The General Counsel filed several exceptions to the ALJ's decision, triggering review by the Board. *See* 29 C.F.R. §§ 101.11, 101.12. The Board "reviews the entire record, including the administrative law judge's decision and recommendations, the exceptions thereto, the complete transcript of evidence, and the exhibits, briefs, and arguments" and "then issues its decision and order in which it may adopt, modify, or reject the findings and recommendations of the administrative law judge." § 101.12(a).

The Board affirmed in part and reversed in part the ALJ's decision. *Ozburn-Hessey*, 366 NLRB No. 173. First, it affirmed the determination that OHL had violated Section 8(a)(5) and (1) of the NLRA "by unilaterally changing its attendance policy in October 2013 without affording the Union notice or the opportunity to bargain," as OHL did not file an exception to that ruling. *Id.* at *1; *see* 29 C.F.R. § 101.11(b). Second, it found that OHL "violated Section 8(a)(5) and (1) by unilaterally announcing and implementing the 2-hour rule, and . . . by discharging Brown in reliance on that unlawful rule." 366 NLRB No. 173, at *3.

---

**[1]**Under Section 8(a)(5), "refus[al] to bargain collectively with the representatives of [one's] employees" is an unfair labor practice. 29 U.S.C. § 158(a)(5). Section 8(a)(1) prohibits "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed" under the NLRA. 29 U.S.C. § 158(a)(1). Thus, "specific violations of Section . . . 8(a)(5) constitute 'derivative' violations of Section 8(a)(1)." *NLRB v. Galicks*, 671 F.3d 602, 608 n.2 (6th Cir. 2012).

The Board noted that the implementation of the two-hour rule was not specifically alleged as an unfair labor practice in the complaint, but nevertheless reached the issue because it was sufficiently connected to the October 2013 change to the attendance policy—which was alleged to be an unfair labor practice in the complaint—and was fully and fairly litigated at the hearing before the ALJ. *Id.* at *2–3. Accordingly, the Board concluded that ruling on the issue would not violate OHL's due process rights. On the merits, OHL "d[id] not dispute that it unilaterally implemented the 2-hour rule without providing the Union notice or an opportunity to bargain and admit[ted] that it discharged Brown pursuant to that rule." *Id.* at *3. The Board ordered OHL to cease and desist from engaging in further unfair labor practices, including changing the terms of employment without first notifying the Union and giving it an opportunity to bargain. *Id.* at *4. It also ordered OHL to take several "affirmative action[s] necessary to effectuate the policies of the Act," including fully reinstating Jermaine Brown and making him "whole for any loss of earnings and other benefits suffered as a result of the unlawful unilateral changes." *Id.* at *5.

OHL petitioned for review of the Board's final order in this court, arguing that the ALJ was correct and that the Board erred by reversing his decision in part. The Board filed a cross-petition for enforcement of its order pursuant to 29 U.S.C. § 160(e). We granted the Union's motion to intervene pursuant to Federal Rule of Appellate Procedure 15(d), as the prevailing party below. *See Auto. Workers, Local 283 v. Scofield*, 382 U.S. 205, 208 (1965).

II.

We review the Board's factual determinations for substantial evidence. 29 U.S.C. § 160(e). "Under that deferential standard, we must uphold the NLRB's factual determinations if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if we may have reached a different conclusion had the matter been before us de novo." *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019) (citations and internal quotation marks omitted). "The Board's application of law to the facts is also reviewed for substantial evidence," *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 542 (6th Cir. 2016), and its "[c]onclusions of law are subject to a de novo review, although [we] will uphold the Board's reasonable interpretation of the NLRA where Congress has not spoken to the contrary

on the same issue," *Dupont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002). Whether a due process violation occurred is a question of law. *Suarez-Diaz v. Holder*, 771 F.3d 935, 942 (6th Cir. 2014).

## III.

OHL argues that the Board improperly reached the two-hour rule issue by misapplying its previous decision in *Pergament United Sales*, 296 NLRB 333 (1989), *enforced*, 920 F.2d 130, thereby infringing on OHL's due process rights. *Pergament* "addressed whether the Board could find a violation of the Act that had not been alleged in either the charge or the General Counsel's complaint." *Serv. Emps. Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 446–47 (2d Cir. 2011). Two elements are required to do so: adequate notice and the opportunity to fully and fairly litigate the issue. *Pergament*, 920 F.2d at 134.

These mirror the requirements of due process. The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The two "fundamental elements of procedural due process are notice and an opportunity to be heard." *Henry Bierce Co. v. NLRB*, 23 F.3d 1101, 1106 (6th Cir. 1994) (citation omitted). "In the context of the [NLRA], due process is satisfied when a complaint gives a respondent fair notice of the acts alleged to constitute the unfair labor practice and when the conduct implicated in the alleged violation has been fully and fairly litigated." *Pergament*, 920 F.2d at 134; *see also Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 552 (5th Cir. 2013) ("Administrative due process, reflecting constitutional standards, requires that '[p]ersons entitled to notice of an agency hearing shall be timely informed of . . . (3) the matters of fact and law asserted.'" (quoting 5 U.S.C. § 554(b)(3)) (alteration and omission in original)).

### A.

To begin, OHL challenges the application of the *Pergament* framework in the first instance. According to OHL, the Board's finding is based on an unpleaded allegation of fact, "namely that the Two Hour Rule was implemented independently at some unspecified time after the unilateral change alleged in the Complaint." And "*Pergament* applies to unpled unfair labor practices, not to unpled allegations of fact." *Dynamic Energy Inc.*, No. 9-CA-45772, 2011 WL

3510208 (NLRB Div. of Judges Aug. 10, 2011) (citing *GPS Terminal Servs.*, 333 NLRB 968 (2001)).

OHL relies on *GPS Terminal Services* to dispute the application of the *Pergament* framework. There, the ALJ amended the complaint in the middle of the hearing—over the General Counsel's objection—to add a factual allegation that a picket line included members of a union. 333 NLRB at 968. The Board reversed, finding that the ALJ had violated the NLRA, which vests in the General Counsel the "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board." 29 U.S.C. § 153(d); *see Elec., Radio Mach. Workers v. NLRB*, 289 F.2d 757, 762 (D.C. Cir. 1960) ("[T]he Board cannot entertain an amendment to the complaint which the general counsel opposes . . . ."). In *GPS Terminal*, the Board addressed and distinguished *Pergament* as follows:

> In appropriate cases, the Board will consider on the merits alleged unfair labor practices, not specifically included in the complaint, if the issue is closely connected to the subject matter of the complaint and was fully litigated at the hearing. *See, e.g.*, *Monroe Mfg.*, 323 NLRB 24, 26 (1997); *Pergament United Sales*, 296 NLRB 333, 334 (1989), *enfd.* 920 F.2d 130 (2d Cir. 1990). However, these principles are not applicable here, as the disputed complaint allegation is an allegation of fact, not an unalleged unfair labor practice claimed to have been fully and fairly litigated. Moreover, the General Counsel has opposed expanding the complaint in this manner.

333 NLRB at 969 n.9.

This case differs from *GPS Terminal* in two ways. First, the ALJ here did not infringe on the General Counsel's role as master of the complaint, and thus did not violate 29 U.S.C. § 153(d). In fact, OHL has no quarrel with the ALJ's decision at all, but rather the Board's review of that decision. Second, the central dispute in this case is over "an unalleged unfair labor practice claimed to have been fully and fairly litigated"—the very thing *GPS Terminal* described as being within the ambit of *Pergament*. *GPS Terminal*, 333 NLRB at 969 n.9. The Board found an additional violation of Section 8(a)(5) and (1) of the NLRA that was not specifically pleaded in the complaint, and OHL mounts a due process challenge to that determination. In doing so, OHL has implicitly admitted that this is exactly the sort of case that should be analyzed under *Pergament*. The factual issue (to the extent there is one at all) is

subordinate to the legal issue.**²** Accordingly, we proceed with our analysis using the *Pergament* framework.

B.

We start with the notice requirement. "The due process clause does not require a precise statement of the theory upon which the General Counsel intends to proceed under the Act, with the threat that failure of precision in pleading will require the General Counsel to re-try the case." *Pergament*, 920 F.2d at 136. "Instead notice must inform the respondent of the acts forming the basis of the complaint." *Id.* at 135. In other words, the notice inquiry prioritizes substance over form. The Board's regulations require that a complaint include "[a] clear and concise description of the acts which are claimed to constitute unfair labor practices, including, where known, the approximate dates and places of such acts" and the identity of the individuals who committed them. 29 C.F.R. § 102.15(b).

OHL's notice of the two-hour rule being at issue begins with Jermaine Brown. While he was still employed at OHL, he emphatically and repeatedly objected to the two-hour rule's application to his disciplinary infractions for leaving early on July 28 and October 10, 2014. Upon initially learning about the two-hour rule, he voiced his concern orally with two superiors. Brown also put it in writing. In an "employee attendance notice" dated December 12, 2014, which gave Brown a "final warning" after he had accumulated thirteen attendance points, Brown refused to sign it and handwrote the following in the comments section: "I have issues with these points (13) because my points suppose [sic] to be (11) because it clearly states in the attendance policy that you only can recieve [sic] (1) point for leaving early!" In another notice dated April 27, 2015, in which Brown's accumulated point total had fallen to twelve, Brown wrote "I refused to sign because of the dates of 7-28-14 + 10-10-14. from my understanding of 'early out' is 1 point!" In light of these numerous objections, it should have come as no surprise to OHL that a claim for wrongful termination of Jermaine Brown would involve the two-hour rule.

---

**²**OHL also cites the Fifth Circuit's decision in *Independent Electrical Contractors of Houston*, but that case is more accurately characterized as a rejection of *Pergament*'s elements on the merits, not one in which the framework did not apply in the first instance. 720 F.3d at 553.

More importantly, OHL received explicit notice from the General Counsel. Months before the hearing, the General Counsel's office exchanged emails with OHL's counsel, Benjamin H. Bodzy. Bodzy asked General Counsel attorney William T. Hearne "[w]hat specifically is the alleged unilateral change to the attendance policy, and when is the Region claiming that it occurred?" Hearne replied that "[t]he unilateral change is the change to the attendance policy on October l, 2013, including the later decision to assess two attendance points to employees who leave work within the first two hours of the employees' shift. The change will likely be alleged to have occurred in or around October 1, 2013." In answering another of Bodzy's questions, Hearne stated that "[t]he Union acknowledges a general awareness of the new attendance policy beginning in 2014 but that it was not aware that employees were being assessed two points for leaving within the first two hours of a shift until following Jermaine Brown's discharge on July 1, 2015." Hearne mentioned the two-hour rule elsewhere in the email as well. This email gave OHL notice in explicit terms that the General Counsel would litigate the two-hour rule issue at the hearing long before the parties tried the case before the ALJ. By itself, this email vitiates OHL's claim that it did not have sufficient notice.

Another consideration relevant to the notice inquiry is whether the unpleaded allegation "is closely connected to the subject matter of the complaint." *Pergament*, 296 NLRB at 334. The complaint alleged that on or "[a]bout October 1, 2013," OHL "[c]hanged the number of attendance points charged" and "[c]hanged the circumstances under which attendance points are charged." This is an accurate characterization of both changes to the attendance policy, except for the date. Both allegations involve changes to the exact same part of the exact same attendance policy: the number of points assigned for leaving early. They also allege the same type of violation under the NLRA—unfair labor practices—based on the same type of conduct— refusal to provide notice to and bargain with a union under Section 8(a)(5) and (1). Additionally, the Board points out that they both "require[] the Company to mount similar, if not identical, defenses." *Pergament*'s requirements are not so strict. Its rule "has been followed in instances when the allegation found involved a different section of the Act than that alleged." *Pergament*, 296 NLRB at 334; *see id.* at n.6 (collecting cases).

One final point involves common sense. OHL highlights that the old attendance policy was less favorable to employees than the new attendance policy; the old policy provided that

employees would receive three points for leaving early. This is true even after the two-hour rule modified the new policy, as it changed the number of points given for some "leaving early" infractions from one to two. It would make absolutely no sense for the General Counsel to file a complaint alleging that Jermaine Brown was terminated solely because of a change to the attendance policy that benefitted him (the October 1, 2013 change). The complaint's allegations as they relate to Jermaine Brown's termination only make sense if they incorporate the two-hour rule.

C.

We now turn to the "fully and fairly litigated" requirement. "[W]hether a matter has been fully litigated rests in part on whether the absence of a specific allegation precluded a respondent from presenting exculpatory evidence or whether the respondent would have altered the conduct of its case at the hearing, had a specific allegation been made." *Pergament*, 296 NLRB at 335 (citing *Chelsea Labs.*, 282 NLRB 500, 501 (1986), *enforced*, 825 F.2d 680 (2d Cir. 1987)). *Pergament*'s rule "has been applied with particular force where the finding of a violation is established by the testimonial admissions of the Respondent's own witnesses." *Id.* at 334; *see id.* at n.7.

First, OHL had the opportunity to cross-examine the General Counsel's witnesses about the two-hour rule. In fact, when the General Counsel called OHL employee Troy Hughlett as a witness, OHL's counsel questioned him regarding the two-hour rule. He also did so when Jermaine Brown testified. The following exchange occurred during that cross-examination:

Q.    BY MR. BODZY: As of October 2014, you were aware that OHL was taking the position you were getting two points for leaving early within the first 2 hours, correct?

A.    Yes.

Q.    Okay. And then after that, you had additional attendance points accrued to the level of termination, correct?

A.    Yes.

Q.    Okay.

JUDGE SANDRON: I mean, I think really the issue boils down to whether it weren't for those two in question, would he have been terminated? So and that's where the issue is, whether those, the extra

points that he was assessed were appropriate or not, because he would not have been terminated if they were -- if they were one point rather than two, correct?

Bodzy confirmed that "that is one of our arguments." Thus, the ALJ and Bodzy discussed not only the two-hour rule but also the legal theory connected to it. In addition, OHL "did not claim lack of notice at the hearing as the testimony evolved, nor did it ask for a continuance in order to present new or different testimony." *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 233 (4th Cir. 2015). And when the General Counsel introduced the September 3, 2014 email from Lisa Johnson (explicitly describing the two-hour rule) into evidence as "General Counsel Exhibit 21," Bodzy stated that he had "[n]o objection" to its admission into the record.

When OHL called its own witnesses at the hearing, its counsel questioned them about the two-hour rule on direct examination. Verdia Jones (Brown's supervisor), Shannon Miles (human resources director), Christopher Brawley (director of operations), and Lisa Johnson (regional human resources manager) all testified about the two-hour rule. In particular, Johnson and Jones discussed it in detail, and Johnson testified about her email explaining it to other OHL employees. Thus, the record shows that the parties fully and fairly litigated the two-hour rule issue at the hearing. OHL "had a full opportunity to cross-examine the General Counsel's witnesses about [the issue], and to put [its own witnesses] on the stand to rebut those witnesses." *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 122 (D.C. Cir. 2001). It is difficult to imagine what OHL would have done differently if the General Counsel's complaint had alleged with specificity the two-hour rule.

OHL argues that "[w]itnesses were not questioned regarding whether the 2-point rule was part of a 'second independent change' at an unspecified date in an unspecified manner." This hyper-technical argument lacks merit. While "the Fifth Amendment protects substantial rights, it does not guarantee any particular form of procedure." *Pergament*, 920 F.2d at 134 (citing *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 351 (1938)). Here, OHL had every opportunity to robustly litigate the two-hour rule issue, and it took advantage of those opportunities. Due process demands nothing more.

D.

OHL also points out that the General Counsel's motion to amend the complaint during the hearing was denied and the Board affirmed that denial. *Ozburn-Hessey*, 366 NLRB No. 173, at *1 n.1. But the motion to amend did not concern the two-hour rule. It focused on a separate change to the attendance policy: the creation of "an introductory period for employees, which reduced the total number of points upon which employees may be discharged." Nevertheless, according to OHL, this shows that the Board's rulings are "entirely inconsistent." That is, the Board "affirmed the finding that it would be unfair to add an allegation arising from the same policy change that was being litigated, while at the same time finding that it would be fair to find a violation based on what the Board itself described as a 'second independent change to the Respondent's attendance policy.'"

We disagree and find no inconsistency in these two positions. In fact, the denial of the motion to amend shows how narrowly the Board decided to apply *Pergament*. Even though the implementation of the introductory period was a part of the same October 1, 2013 change to the attendance policy, the Board decided that it was not closely related enough to the attendance points change. The two-hour rule, on the other hand, involved the exact same subpart of the attendance policy as the pleaded allegation. OHL's dogmatic focus on the independent timing of the two-hour rule's implementation ignores the more important fact that these two changes to the attendance policy concerned identical subject matter.

Because OHL had ample notice of the two-hour rule issue and actively litigated it at the hearing, we reject its due process challenge.

IV.

OHL also argues, consistent with the ALJ's decision, that the change to the attendance policy did not cause Jermaine Brown's firing. An "employer may avoid having to reinstate and pay backpay to an employee discharged pursuant to an unlawfully instituted rule or policy if the employer demonstrates that it would have discharged the employee even absent that rule or policy." *Great W. Produce*, 299 NLRB 1004, 1006 (1990), *overruled on other grounds by Anheuser-Busch, Inc.*, 351 NLRB 644 (2007). In this case, the parties do not "dispute that Brown committed all of the attendance infractions for which he was ultimately terminated."

Because the new policy was more favorable to Brown than the old one—even after the implementation of the two-hour rule—the ALJ held that "Brown benefitted in that he accrued the 13 points at a later time and [the change] thus delayed rather than hastened his discharge."

This view oversimplifies the facts.  If OHL had changed its attendance policy only once, reducing the number of points for leaving early from three to two, then OHL's causation argument would have merit.  Instead, OHL made two independent changes to the policy, causing new harm to the union each time by refusing to notify or bargain with it.  With the first change, the Board found that OHL had "in effect created a new status quo, upon which Brown understandably relied." *Ozburn-Hessey*, 366 NLRB No. 173, at *3 n.8.  The time in between the two changes, during which employees' expectations and behavior adapted to the new rules, makes all the difference.  What's more, OHL implemented the two-hour rule without informing its employees of the change.  Jermaine Brown only learned of the rule after he received extra points for two attendance violations, further justifying his reliance on the policy as it existed after the first change.  We agree with the Board's ruling that but for the implementation of the two-hour rule, Jermaine Brown would not have been terminated.[3]

OHL grouses in its reply brief that it is "not the lawbreaker that the Board paints it to be," and it only "turned out to have a bargaining obligation" after "the outcome of the union's election was actively . . . litigated."  But "the Board ordinarily considers a union the elected representative of a bargaining unit as of the date of its election, not the date of its certification." *United Food & Commercial Workers v. NLRB*, 519 F.3d 490, 496 (D.C. Cir. 2008).  And "an employer may not box the union in on future bargaining positions by implementing changes of policy and practice during the period when objections or determinative challenges to the election are pending." *Contemporary Cars, Inc. v. NLRB*, 814 F.3d 859, 877 (7th Cir. 2016) (internal quotation marks omitted).  If an employer chooses to make such changes during this period of uncertainty, it does so at its peril. *Id.*  Here, OHL chose to dispute the results of the representation election and then unilaterally make substantive changes to its attendance policy

---

[3]The ALJ held otherwise because it refused to consider the two-hour rule in its analysis.  Since the Board did not plead the two-hour rule allegation, the ALJ stated that "[t]he basis for determining whether the Respondent's unilateral action harmed Brown has to be the policy before and after the mid-October 2013 change."  As discussed above, we disagree with this premise because OHL had notice of the two-hour rule issue and fully and fairly litigated it before the ALJ.

while those challenges were pending.  OHL thus had multiple opportunities to prevent its current predicament.

V.

For these reasons, we deny OHL's petition for review and grant the Board's cross-petition for enforcement.