SIERRA REALTY CORP., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 95–1349.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 26, 1996.

Decided May 3, 1996.

Rehearing and Suggestion for Rehearing
In Banc Denied July 9, 1996.

Sidney Orenstein argued the cause and filed the briefs, New York City, for petitioner.

William A. Baudler, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney.

Before: SILBERMAN, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Sierra Realty Corporation manages commercial real estate in New York. From 1984 until 1992, two employees of Supreme Building Maintenance Corporation provided maintenance services for one of Sierra Realty's buildings in Manhattan. Supreme paid its employees and then billed Sierra Realty the gross payroll, including fringe benefits, plus 3% for supervision and 20% for administrative overhead and profit. By 1992, the building was losing money due to vacancies, rent reductions and high operating costs. Sierra Realty therefore decided to end its contract with Supreme and to employ its own maintenance crew, for fewer hours and at lower wages and benefits. Sierra Realty filled the two positions without offering jobs to Supreme's employees—Hector Delgado and Oswaldo De LaRosa—both of whom were members of the Service Employees International, Local 32B–32J. Supreme had a collective bargaining agreement with this union, which represented 200 of its employees working at 300 customer locations.

The National Labor Relations Board found that in making its hiring decision, Sierra Realty violated § 8(a)(3) of the National Labor Relations Act by discriminating against the two workers on the basis of their union membership. The Board also found that because Sierra Realty would have hired the two employees but for its unlawful discrimination, Sierra Realty was a successor to Supreme. Therefore, finding that the two-person workforce at the Manhattan building constituted an appropriate bargaining unit, the Board held that Sierra Realty violated § 8(a)(5) by refusing to bargain with the employees' union.

Section 8(a)(3) makes it an unfair labor practice for an employer to "discourage membership in any labor organization" by "discriminat[ing] in regard to hire or tenure of employment." 29 U.S.C. § 158(a)(3). If the employer's actions do not have an "inherently destructive" effect on union activity— all agree Sierra's did not—the Board focuses on the motivation for the employer's action. The Board must establish that the employer's actions were motivated by an anti-union animus. If the Board succeeds, the employer still can successfully mount an affirmative defense by showing that it would have taken the same action in the absence of anti-union considerations. *Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct.

1612, 71 L.Ed.2d 848 (1982); *Elastic Stop Nut Div. of Harvard Indus. v. NLRB,* 921 F.2d 1275, 1279–80 (D.C.Cir.1990).

■ No one questions Sierra Realty's right to terminate its contract with Supreme and hire its own maintenance employees in order to save money, as it did on June 1, 1992. In bringing the maintenance work in-house, the company had no obligation to bargain with the union concerning its hiring decisions. *NLRB v. Burns Int'l Security Servs., Inc.,* 406 U.S. 272, 294–95, 92 S.Ct. 1571, 1585–86, 32 L.Ed.2d 61 (1972). As far as the labor laws are concerned, the company's only duty was to make those decisions on a basis other than hostility to a union. It is a given that Sierra Realty's failure to hire Delgado and De LaRosa stemmed from the company's desire to reduce costs at the building. *Sierra Realty Corp.,* 317 N.L.R.B. 832, 841, 1995 WL 353122 (1995). Although terminating the contract eliminated the 23% add-on Supreme had been charging, Sierra Realty looked for greater savings by reducing wages, benefits and hours. The administrative law judge, ruling in the company's favor and relying on *Vantage Petroleum Corp.,* 247 N.L.R.B. 1492, 1980 WL 11189 (1980), concluded that Sierra Realty failed to hire Delgado and De LaRosa "in order to avoid the Union wage scale," which was "different from refusing to hire employees in order to avoid the Union." *Sierra Realty,* 317 N.L.R.B. at 841. The Board thought otherwise: "They were refused hire solely because of their union wages and the unlawfulness of that decision is in no way minimized or affected by the fact that Respondent may have believed that by hiring them it would cost it money or time and effort in bargaining with the Union." *Id.* at 834. *Vantage Petroleum* did not apply, the Board said, because in "that case the employees conditioned their job applications on their existing union wages and benefits." *Id.* at 834–35.

It is a bit misleading to frame the problem here in terms of Sierra Realty's "refusing" to hire Delgado and De LaRosa. Putting the matter this way, as the Board did, suggests that these individuals applied for a job and that Sierra Realty turned them down.

Something rather different occurred. Neither Delgado and De LaRosa ever asked Sierra Realty to continue their employment. Neither submitted an application for employment. When they met with the company's vice president in early May 1992, they expressed no interest in remaining at this job. In referring to a "refusal" to hire, the Board must have had in mind an undated mailgram a union officer sent to Sierra Realty. The mailgram stated that the union represented the employees at the Manhattan building, that the union had learned of Sierra Realty's decision to perform its own maintenance work there, and that "we make unconditional application for continued employment of" Delgado and De LaRosa. *Id.* at 834.

■ Stressing the "unconditional," the Board treated the mailgram as the equivalent of an employment application without any strings attached. On this basis the Board rejected the company's contention that it failed to offer employment to Delgado and De LaRosa because it believed they would not accept the lower pay, lower benefits and lower working hours the company planned to put in effect on June 1. There are several problems with the Board's reasoning. One stems from the fact that the mailgram was not an individual employment application. It was a communication from the union on behalf of the union's members. As such it imposed no obligation on Sierra Realty. The company had no relationship with the union. And it had no duty to begin a relationship by dealing with the union in its representational capacity. *Burns Int'l Servs.,* 406 U.S. at 295, 92 S.Ct. at 1586. Furthermore, it is inconsistent for the Board to say that Sierra Realty "refused" to hire these individuals because the company thought it would have to pay them at the union wage, and then to conclude that in light of the "unconditional" nature of the offer made by the union on their behalf, the company knew it could have paid them less than the union wage. The two propositions cannot stand together.

As to the company's explanation for its actions, Sierra Realty knew that under the terms of the collective bargaining agreement between Supreme and the union, Supreme's workers were entitled to exercise their se-

niority rights and retain their jobs with Supreme at the same wage and benefit levels. When a senior employee was laid off he could transfer to another building and displace a less senior employee. Delgado and De La-Rosa had worked for Supreme for 14 and 13 years respectively. Supreme had been in business for only 14 years. These individuals were necessarily among Supreme's most senior employees and the record shows that Sierra Realty knew as much. Sierra Realty's vice president told Delgado and De LaRosa that they should go to the union and invoke their seniority rights so that they could continue working for Supreme at the same union-negotiated wage rate.

Sierra Realty had made it clear that it wanted to hire its own people to work "less hours at lower fringe benefits and wages." In light of Sierra's intentions and its knowledge of Delgado and De LaRosa's rights under the collective bargaining agreement, Sierra Realty assumed that the workers would not accept the lower wages and benefits it was offering. Given these circumstances, the case is indistinguishable from *Vantage Petroleum*, on which the ALJ relied.

Vantage Petroleum had been awarded a contract to operate gasoline service stations on state parkways then being run by Exxon and Mobil. A union steward acting on behalf of several union members who were working for Exxon pursuant to a collective bargaining agreement expressed interest in continued employment. Like Sierra Realty, Vantage Petroleum did not negotiate with the union, it did not offer employment to the Exxon workers, and it did not hire them. The Board ruled that Vantage Petroleum had not violated § 8(a)(3).

In this case, the Board said that its *Vantage Petroleum* decision turned on the fact that the Exxon employees had conditioned their application for employment with Vantage Petroleum on their receiving the same wages and benefits, while here, Sierra Realty merely assumed that Supreme's employees would not accept lower wages and benefits. *Sierra Realty,* 317 N.L.R.B. at 834–35. The Board's distinction does not hold up. Only some—not all—Exxon employees eventually demanded to be hired at

their existing wages. And their demand came well *after* Vantage Petroleum had already made its hiring decisions and filled the jobs. *Vantage Petroleum,* 247 N.L.R.B. at 1492–93. The question in *Vantage Petroleum,* and the question here, was whether the new employer violated § 8(a)(3) when it made its hiring decisions. On that subject, *Vantage Petroleum* held: "consistent with Respondent's awareness that the Exxon employees were then working for a higher rate than it was willing to pay, Respondent *had reason to assume that those employees in all likelihood would not want to suffer a reduction in that rate.*" *Id.* at 1493 (italics added). This quotation contains a legal principle. Under § 8(a)(3), a new employer who will be paying lower wages has no duty *sua sponte* to make offers to current union workers if the employer has reason to assume the workers would not want to perform the same job for less money. Such an employer has not discriminated on the basis of union affiliation in hiring workers within the meaning of § 8(a)(3) as first interpreted in *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 182–87, 61 S.Ct. 845, 846–49, 85 L.Ed. 1271 (1941).

Applied to this case, the *Vantage Petroleum* rule leads not to the Board's conclusion, but to its opposite. Sierra Realty presented a far more compelling case than *Vantage Petroleum.* The choice facing the Exxon employees in *Vantage Petroleum* was to seek employment elsewhere or take a pay cut. Without offering them a job, the new employer assumed that, given these options, the employees would prefer to seek employment elsewhere. No such choice faced Delgado or De LaRosa. As Sierra Realty knew, these two employees would be able to exercise their seniority rights and retain their jobs with Supreme. The collective bargaining agreement between Supreme and the union guaranteed as much. Only if Delgado and De LaRosa signed up with Sierra Realty would they suffer a loss of pay or benefits. It is irrational to suppose that any rational human being, in this situation, would throw away years of seniority and give up a higher paying job in order to accept a job involving the same type of work in the same general location at lower wages and benefits, and

fewer hours. Yet this is precisely what the Board must have supposed in finding a § 8(a)(3) violation in this case. If the new employer in *Vantage Petroleum* had "reason to assume" the employees there would "in all likelihood" not be interested in staying on after the takeover, Sierra Realty had all the more reason for assuming that these two employees would be unwilling to give up their jobs with Supreme in order to start working for Sierra Realty.

*Vantage Petroleum* is important for another reason. We have already mentioned the union's correspondence with Sierra Realty and the failure of Delgado and De LaRosa to ask the company to retain them. In *Vantage Petroleum* the Board discussed the same type of situation, ruling that the new employer "had no obligation ... to initiate the employment relationship," and that it was "within its rights to expect that persons seeking employment with it would first submit applications." 247 N.L.R.B. at 1494. That a union official in *Vantage Petroleum* made overtures to new employer on behalf of union members had no effect on the Board's decision—and it therefore should not have had any effect here.

■ *Vantage Petroleum,* in short, should have been controlling. The Board did not purport to overrule that decision or to qualify it in any way. *Compare Daily News of Los Angeles v. NLRB,* 979 F.2d 1571, 1574–76 (D.C.Cir.1992), *with Consolidated Freightways v. NLRB,* 892 F.2d 1052, 1056 (D.C.Cir. 1989). Having misapplied the legal principle set down in *Vantage Petroleum,* the Board is unable to support its § 8(a)(3) finding against Sierra Realty with substantial evidence. The Board's finding of a § 8(a)(5) violation also cannot stand; it rested on the § 8(a)(3) violation. Sierra Realty's petition for review is granted and enforcement of the Board's order is denied.