# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 17, 2021       Decided August 26, 2022

No. 20-1411

EVERPORT TERMINAL SERVICES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, DISTRICT LODGE 190, LOCAL LODGE
1546, AFL-CIO AND INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS, DISTRICT LODGE
190, LOCAL LODGE 1414, AFL-CIO,
INTERVENORS

———

Consolidated with 20-1412, 20-1432

———

On Petitions for Review and Cross Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Ashley C. Parrish* argued the cause for petitioner Everport Terminal Services, Inc. On the briefs were *Jeffrey S. Bucholtz* and *Brigham M. Cheney*.

*Emily M. Maglio* argued the cause for petitioner International Longshore and Warehouse Union. With her on the briefs was *Eleanor Morton*.

*Gregoire Sauter*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Julie Broido*, Supervisory Attorney.

*David A. Rosenfeld* argued the cause and filed the brief for intervenors in support of respondent.

Before: SRINIVASAN, *Chief Judge*, RAO, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: This case arises from a dispute over which union—the International Association of Machinists ("IAM") or the International Longshore and Warehouse Union ("ILWU")—is entitled to represent the mechanic workforce at the Ben Nutter Terminal in Oakland, California. For many years, the Terminal's mechanics were represented by the IAM. In 2015, Everport Terminal Services, Inc., took over the Terminal's operation and decided to hire a new workforce. As a member of the multi-employer Pacific Maritime Association ("PMA"), Everport was party to a collective bargaining agreement negotiated between the PMA and the ILWU. As Everport read that agreement, it required Everport to prioritize ILWU applicants in hiring its new mechanics and to recognize the ILWU as their representative. Everport therefore gave qualified ILWU applicants first choice of the available mechanic positions, filling the remaining vacancies with

applicants from the Terminal's existing, IAM-represented workforce.

After the IAM cried foul, the National Labor Relations Board ("Board") found that Everport had unlawfully discriminated against the Terminal's incumbent mechanics on the basis of their IAM affiliation; that it had violated its statutory obligation to recognize and bargain with the incumbent mechanics' chosen union, the IAM; and that it had prematurely recognized the ILWU as the representative of the Terminal's mechanics. The Board also found the ILWU had unlawfully demanded and accepted recognition from Everport. In its order, the Board did not dispute—or even engage with—Everport's reading of the PMA-ILWU agreement, instead dismissing it as a "red herring." Because that was arbitrary, we grant the petitions for review and vacate the Board's order.

I.

A.

Workers at West Coast ports have historically bargained with their employers on a coastwide basis. In 1938, the Board certified the ILWU as the bargaining representative for "all the workers employed at longshore labor in the Pacific Coast ports of the United States." *Shipowners' Ass'n of the Pac. Coast*, 7 NLRB 1002, 1022 (1938). Coastwide representation was necessary, the Board found, because employers were coordinating workers' terms of employment on a coastwide basis. *See id.* at 1023–24; *see also Cal. Cartage Co. v. NLRB*, 822 F.2d 1203, 1206 (D.C. Cir. 1987) (explaining the Board's decision in *Shipowners*). Since 1949, West Coast port operators have bargained with the ILWU through the Pacific Maritime Association, a "multi-employer bargaining representative … with the primary purpose of negotiating, executing, and administering collective bargaining agreements." *PMA v.*

4

*NLRB*, 967 F.3d 878, 881 (D.C. Cir. 2020). ILWU members will work only for port operators that are in the PMA, and because of the Board's decision to certify a coastwide bargaining unit, the ILWU represents virtually all skilled longshoremen on the West Coast.

All PMA employers are bound by the terms of a collective bargaining agreement negotiated between the PMA and the ILWU, the Pacific Coast Longshore Contract Document ("Longshore Contract"). The Longshore Contract specifies the longshore jobs PMA employers must give to ILWU members. It also sets the terms of employment for those workers—the wages and benefits they receive, the process through which they are hired, and the reasons for which they may be fired.

The Longshore Contract's scope is broad, reaching "[v]irtually all longshore work at West Coast ports," *ILWU v. NLRB* ("*Kinder Morgan*"), 978 F.3d 625, 630 (9th Cir. 2020), and the Board has upheld many of its jurisdiction setting provisions as consistent with the National Labor Relations Act, *see PMA*, 256 NLRB 769, 770 (1981); *cf. IAM, Loc. Lodge No. 1484 v. ILWU, Loc. 13*, 781 F.2d 685, 688 n.2 (9th Cir. 1986). In its earliest iterations, it covered stevedore work—i.e., loading and unloading ships. Later, the PMA and the ILWU expanded the Longshore Contract to cover mechanics—the workers who maintain and repair the equipment used to load and unload ships—but agreed that PMA members who had employed non-ILWU mechanics before 1978 could continue doing so. *PMA*, 256 NLRB at 769–70. The parties again modified the Longshore Contract in 2008, making clear that mechanic work at "all new marine terminal facilities that commence operations after July 1, 2008, shall be assigned to the ILWU." As before, however, they made an exception for terminals where non-ILWU mechanics were employed before 2008—sites the parties designated as "red-circled." Thus, if

non-ILWU mechanics had been employed at a terminal since before 1978, the Longshore Contract's amendments permit PMA members to continue employing them.

For all work that falls within its scope, the Longshore Contract sets out a hiring process that PMA members must follow. At each port on the West Coast, the ILWU maintains dispatch halls where ILWU jobseekers may submit applications. PMA members may hire only from these dispatch halls and must allocate work based on applicants' qualifications, skills, and seniority. The PMA and the ILWU, however, have historically made a limited exception for mechanics. If there are too few ILWU members seeking mechanic work at the relevant dispatch hall, then after offering jobs to all of the hall's qualified mechanics, a PMA member may fill any remaining vacancies "off the street." These non-ILWU hires are onboarded through the so-called "Herman-Flynn process." Off-the-street hires are subjected to a ninety-day probationary period, after which they become "registered" employees that are entitled to the same benefits as ILWU members and are required to pay ILWU dues.

## B.

This case centers on twenty-seven mechanic positions at the Ben Nutter Terminal. The Terminal was "red-circled" in 2008 because non-ILWU mechanics had been working there since before 1978.

For many decades, the Terminal was operated by two PMA members—Marine Terminals Corporation ("Marine") and its subsidiary, Miles Motor Transport System ("Miles")—whose stevedores were represented by the ILWU and whose

mechanics were represented by the IAM.[1] In 2002, Evergreen Marine Corporation acquired the right to operate the Terminal and then subcontracted the Terminal's operation to Marine and Miles. In 2012, Evergreen entrusted the Terminal's operation to its subsidiary, Everport, which again rehired Marine and Miles to run the Terminal. The same workforce remained at the Terminal—Marine and Miles continued using ILWU-represented stevedores and IAM-represented mechanics—and Everport had no direct relationship with these workers.

In 2015, dissatisfied with the state of the Terminal's operations, Everport resolved to operate the Terminal itself and informed Marine and Miles that their contract would end on December 4, 2015. Everport needed to hire stevedores from the ILWU to run the Terminal, so it joined the PMA in June 2015. Everport explored subcontracting the Terminal's mechanic work, but ultimately decided to employ the Terminal's mechanics directly.

The ILWU informed Everport that if it chose to employ its own mechanics, it would need to hire them from the local dispatch hall. "[T]he 'red-circle' waiver at the [Terminal] is fully based on the direct bargaining relationship between [Marine and Miles] and IAM," the ILWU explained. "Upon termination of the subcontracting relationship with [Marine and Miles ], the 'red circle' waiver no longer applies." After Marine and Miles ceased operations, the Terminal would become a "new marine terminal"—which the Longshore Contract defined to include "vacated facilities." As such, its red-circle status would lapse and the Terminal's mechanic jobs would come within the ILWU's jurisdiction. Therefore,

---

[1] The mechanics employed by Marine and Miles were divided into two separate IAM-affiliated bargaining units, but for the purposes of this opinion we refer to them as a single bargaining "unit."

according to the ILWU, Everport was obligated to hire its mechanics from the ILWU dispatch hall and, if necessary, through the Herman-Flynn process. The ILWU was clear that "failure to comply with the full terms of the [Longshore Contract] will result in the Union pursuing all available remedies."

Unsure of its obligations, Everport consulted the PMA, which corroborated the ILWU's reading of the Longshore Contract. According to the PMA, after Marine and Miles ceased operations at the Terminal, it would "no longer [be] a red-circle facility because Everport had no prior agreement with any union at the Terminal and the Terminal was [being] vacated." Based on the PMA and the ILWU's mutual understanding of their contract, Everport told the ILWU that "qualified [ILWU] workers will receive first consideration for steady mechanic jobs." Everport indicated that if vacancies remained after exhausting the pool of qualified ILWU applicants, it would try to rehire the mechanics currently working for Marine and Miles.

After learning of Everport's job postings at the ILWU dispatch hall, the IAM demanded that Everport recognize it as the rightful bargaining representative of the Terminal's mechanics. In response, Everport explained its interpretation of the Longshore Contract and why it had to prioritize ILWU applicants for the Terminal's mechanic positions after the Terminal's red-circle designation lapsed.

Everport began hiring mechanics in late November. It first interviewed candidates who had submitted applications through the ILWU hiring hall; afterwards, it considered Marine and Miles' employees, treating them as off-the-street, potential Herman-Flynn hires. Everport's interviewers kept notes about which applicants were ILWU-represented and which were not.

8

Everport ultimately hired fifteen ILWU applicants and twelve applicants from Marine and Miles' mechanic workforce.

The Terminal reopened under Everport's operation in December 2015. Pursuant to the Herman-Flynn process, Everport treated Marine and Miles' former mechanics as new hires, which meant they lost the seniority-based benefits they had formerly received from Marine and Miles as IAM members. With minor exceptions, Everport's mechanics did the same work, in the same conditions, as their predecessors.

C.

Soon after Everport reopened the Terminal, the IAM filed charges, arguing that Everport and the ILWU had colluded to discriminate against Marine and Miles' mechanics—depriving some of them of their jobs, unilaterally changing their terms and conditions of employment, and violating their right to be represented by the union of their choice. After investigating, the Board's General Counsel filed a complaint against Everport and the ILWU.

The administrative law judge ("ALJ") sided with the IAM. *See Everport Terminal Servs., Inc.*, 370 NLRB No. 28, slip op. at 45–46 (Sept. 30, 2020). Specifically, she found that Everport had unlawfully discriminated against IAM-represented mechanics on the basis of their union affiliation, *see* 29 U.S.C. § 158(a)(1), (3), and had prematurely recognized and bargained with the ILWU before it was clear that Everport's mechanics would choose to be ILWU-represented, *see id.* § 158(a)(1)–(2). The ALJ also found that Everport was a "successor employer" of Marine and Miles under *NLRB v. Burns International Security Services*, 406 U.S. 272 (1972). Everport therefore had a duty to bargain with the incumbent mechanics' chosen union, a duty it breached by refusing to recognize the IAM. *See* 29 U.S.C. § 158(a)(1), (5). Further, the ALJ found that because

Everport's hiring process was infused by a general "animus" towards the IAM, it was also a "perfectly clear" successor under *Burns*, and therefore lost the right to set its mechanics' terms and conditions of employment. *Everport*, slip op. at 33; *see also Karl Kallmann* ("*Love's Barbeque*"), 245 NLRB 78, 82 (1979), *enf'd in relevant part*, 640 F.2d 1094 (9th Cir. 1981). Everport's unilateral imposition of the Longshore Contract's terms onto the Terminal's existing workforce was therefore unlawful. *See* 29 U.S.C. § 158(a)(1), (5). Finally, the ALJ found that the ILWU had demanded recognition "before Everport began operations and when it did not represent an uncoerced majority of the [Terminal's mechanics]," and had unlawfully induced Everport to discriminate against the incumbent mechanics based on their IAM affiliation. *Everport*, slip op. at 46 (finding violations of 29 U.S.C. § 158(b)(1)(A), (b)(2)).

After Everport and the ILWU appealed, a three-member panel of the Board adopted the ALJ's findings and conclusions. *See id.* at 1–2. With respect to the conclusion that Everport had unlawfully imposed the Longshore Contract on the Terminal's mechanics, the panel split as to the ALJ's reasoning. Two of the Board members agreed with the ALJ that because Everport had "used a general discriminatory hiring plan applicable to *all* applicants from the predecessor workforce," it was not only a *Burns* successor, but had also forfeited the right to set its mechanics' initial terms and conditions of employment.[2] *Id*. at 1 n.4. In the alternative, however, all three Board members agreed that even if Everport had retained the right to set its mechanics' initial terms of employment, its recognition of the

---

[2] Member Emanuel would have found that Everport retained the right to set its mechanics' terms of employment. In his view, it was not clear that but for Everport's discrimination, all or substantially all of the Terminal's incumbent mechanics would have retained their jobs.

ILWU as its mechanics' representative was still premature, and so its imposition of the Longshore Contract onto those mechanics was unlawful.

The Board ordered Everport to revoke its recognition of the ILWU, cease applying the Longshore Contract to its mechanics, recognize and bargain with the IAM, and offer to rehire any IAM mechanics who had lost their jobs. It also ordered Everport and the ILWU to make whole any workers who were financially harmed by the unfair labor practices.

Everport and the ILWU each timely petitioned for review, challenging the Board's conclusions as arbitrary and capricious in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). The Board filed a cross application, asking this court to enforce its order, and the IAM intervened on the Board's behalf. We have jurisdiction under 29 U.S.C. § 160(e), (f).

## II.

We begin with the Board's finding that Everport was a successor employer to Marine and Miles' mechanics and that it unlawfully refused to recognize their chosen union, the IAM.

It is an "unfair labor practice for an employer … to refuse to bargain collectively with the representatives of his employees." *Id.* § 158(a)(5). When a business with unionized employees changes hands, the new owner ordinarily has no duty to recognize the union that represented the predecessors' employees: unless rehired, they are not "*his* employees." *Id.* (emphasis added); *see Burns,* 406 U.S. at 280 n.5; *cf. Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd.*, 417 U.S. 249, 261 (1974) ("[N]othing in the federal labor laws requires that an employer who purchases the assets of a business … hire all of the employees of the predecessor.") (cleaned up). But "[i]f the

new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor," the employer also inherits his predecessor's duty to bargain with the incumbent union. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987).

A new business owner inherits its predecessor's duty to bargain, in other words, if (1) its employees continue to perform substantially the same work after the handover; (2) the existing bargaining unit remains appropriate; and (3) "the majority of its employees were employed by its predecessor." *Id.*; *see also Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 114 (D.C. Cir. 1996). The third requirement can also be satisfied even where the predecessor's employees do not constitute a majority of the successor's employees. If the Board finds that antiunion animus distorted its hiring process, "the Board presumes that but for such discrimination, the successor would have hired a majority of incumbent employees." *NLRB v. CNN Am., Inc*., 865 F.3d 740, 752 (D.C. Cir. 2017) (cleaned up). By contrast, if the employer relies on "valid business reason[s]" in hiring its new workforce, it does not inherit any bargaining obligation. *Love's Barbeque*, 245 NLRB at 81.

Here, the Board found that (1) the Terminal's mechanics continued to do substantially the same work after Everport began directing the Terminal's operations; (2) a mechanic-specific bargaining unit remained appropriate; and (3) Everport's hiring process was marred by animus towards the IAM. Everport therefore had a duty to bargain with the incumbent union, and its refusal to do so was unlawful. Everport and the ILWU do not contest the Board's first finding, but argue that the second and third were arbitrary and capricious. We agree.

12

A.

In holding that a mechanic-specific bargaining unit remained appropriate after Everport took over the Terminal's operation, the Board arbitrarily ignored its precedents and the language of the Longshore Contract.

Before any unionization vote can take place, the Board must determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). Unit-appropriateness determinations are fact specific, so we generally defer to the "broad discretion" of the Board. *United Food & Com. Workers v. NLRB*, 519 F.3d 490, 494 (D.C. Cir. 2008). But a "bargaining unit determination will not stand if arbitrary." *Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1014 (D.C. Cir. 1995).

In successorship cases, the Board presumes that a "change in ownership should not uproot bargaining units that have enjoyed a history of collective bargaining unless the units no longer conform reasonably well to other standards of appropriateness." *Cadillac Asphalt Paving Co.*, 349 NLRB 6, 9 (2007) (cleaned up). To rebut that presumption, the new owner must identify "compelling circumstances sufficient to overcome the significance of bargaining history," *Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1085 (D.C. Cir. 2003) (cleaned up)—for instance, that the existing unit has become "repugnant to Board policy," *Trident Seafoods*, 101 F.3d at 118 (cleaned up).

In this case, Everport told the Board that, as a PMA member, it was bound by the Longshore Contract's terms, and that because the Terminal's red-circle status had lapsed, it was obligated to recognize the ILWU as the bargaining representative of all its employees at the Terminal, mechanics included. Under Everport's reading of the Longshore Contract,

13

in other words, a mechanic-specific bargaining unit was "inappropriate as a matter of law."

If Everport's interpretation of the Longshore Contract were correct, the only unit appropriate for the Terminal's mechanic workforce was the coastwide one created in *Shipowners* and reinforced in subsequent Board decisions. In *Shipowners*, the Board determined that a coastwide unit was appropriate for all longshoremen on the West Coast. *See* 7 NLRB at 1022–25. As a result of that decision, all PMA members' employees who come within the Longshore Contract's scope can be represented only by the ILWU. Furthermore, in *PMA*, the Board found that, subject to narrow exceptions, the Longshore Contract's "clear" terms assign all mechanic work at PMA-operated terminals to the ILWU. 256 NLRB at 770; *cf. Kinder Morgan*, 978 F.3d at 642 (concluding that "the plain language of the [Longshore Contract] unambiguously assigns to the [ILWU] all [mechanic] work, on all present and future stevedore cargo handling equipment … for all PMA members, at all West Coast ports," subject to the exceptions inserted in 1978 and 2008). On Everport's understanding that the Terminal's red-circle status had lapsed, if Everport had recognized a mechanic-specific unit and continued to bargain with the IAM, it would have violated its duty under the Longshore Contract to bargain only with the ILWU's coastwide unit.

Nevertheless, the Board found that a mechanic-specific bargaining unit remained appropriate after Everport took over Terminal operations. To explain this decision, it was necessary for the Board to answer the objections of Everport and the ILWU on the merits, particularly as the Board gives "controlling weight" to the parties' interpretation of their collective bargaining agreement. *Mining Specialists, Inc*., 314 NLRB 268, 268 (1994). The Board, however, refused to

engage Everport's reading of the Longshore Contract, dismissing the question of whether the Terminal remained red-circled as a "red herring." *Everport*, slip op. at 43. Before this court, the Board again represented that Everport's obligations as a PMA member were "irrelevant" to the successorship question. The Board gave two reasons for this position, but neither is persuasive.

First, the Board argued that Everport's PMA membership was irrelevant because the IAM was "not a party to the PMA-ILWU Agreement, so it did not agree to [the red-circle] provisions." *Id.* But while the Board ordinarily seeks to keep intact long-established bargaining units, its precedents require it to ensure that any established unit "remains appropriate *for the successor employer*." *Walden Sec., Inc.*, 366 NLRB No. 44, slip op. at 11 (Mar. 23, 2018) (emphasis added). To determine whether a mechanic-specific unit was appropriate for Everport, the Board had to analyze whether bargaining with such a unit would have been consistent with Everport's obligations under the Longshore Contract. The Board cannot simply label a substantial contractual argument a "red herring" in order to avoid addressing it. *Everport*, slip op. at 43.

Second, the Board intimated in its order that the Longshore Contract actually permitted Everport to bargain with a mechanic-specific unit, irrespective of whether the Terminal remained red-circled. For instance, it claimed that "[t]he red-circle language … recognizes that a number of [mechanic] units were not historically represented by ILWU." *Id*. at 41. But the fact that a number of units were not historically represented by the ILWU does not support the conclusion that Everport could bargain with a mechanic-specific unit even if the Terminal's red-circle status lapsed. The Longshore Contract clearly covers mechanics unless a relevant exception applies. Therefore, only if the Terminal remained red-circled could

Everport bargain with a mechanic-specific unit, but that was the question the Board refused to answer.

The Board also sought to rely on the fact that Everport considered hiring a subcontractor that could retain Marine and Miles' mechanics, claiming that such actions were "contradictory to Everport's position that the red circle language no longer applied" after it joined the PMA. *Id.* at 39. Everport's behavior, however, was entirely consistent with its reading of the Longshore Contract. If Everport had found a subcontractor to oversee mechanic work at the Terminal, and if that subcontractor was not a PMA member, then the subcontractor could potentially have rehired Marine and Miles' workers and recognized the IAM as their representative. Here again, the Board's reason for ignoring Everport's contractual obligations was unfounded.

Finally, although *PMA* held the Longshore Contract clearly assigns all mechanic work at PMA-operated terminals to the ILWU, so long as no exception applies, the Board argued that *PMA* was not controlling because that case "had no successorship issues." *Everport*, slip op. at 41. The Board cannot evade its precedents so easily. That the Longshore Contract's "clear" terms require PMA members to hire their mechanics from the ILWU, absent an applicable exception, was central to the Board's conclusion in *PMA*. 256 NLRB at 770. The Board also deflected by arguing that the version of the Longshore Contract at issue in *PMA* was "superseded in 2008 with [the] red circle language." *Everport*, slip op. at 41. That is true, but it does not excuse the Board's failure to assess whether the Terminal in fact remained red-circled. If the red-circle status had lapsed before Everport began operations, Everport would have had a "clear" duty to bargain with the coastwide ILWU unit. *PMA*, 256 NLRB at 770. In other words, without showing why Everport's reading of the Longshore

Contract was in error, the Board could not square its unit-appropriateness finding with *PMA*.

In "certify[ing] appropriate bargaining units … the Board cannot ignore its own relevant precedent but must explain why it is not controlling." *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 60 (D.C. Cir. 2004) (cleaned up). Here, both *Shipowners* and *PMA* required Everport to recognize the ILWU as the sole representative of all employees that came within the Longshore Contract's scope. The Board could not find that a mechanic-specific unit was appropriate, therefore, without determining whether the Terminal's mechanics were covered by the Longshore Contract. Because the Board "entirely failed to consider [that] important aspect of the problem," its selection of a mechanic-specific bargaining unit was unreasonable. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

## B.

The Board also concluded that Everport's hiring process was distorted by animus towards the IAM. That too was arbitrary.

As explained above, the third prong of the *Burns* successorship test is satisfied if the Board finds that a new employer's hiring decisions were motivated by antiunion animus. *Love's Barbeque*, 245 NLRB at 82; *Cap. Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1005 (D.C. Cir. 1998). In other words, a new business owner cannot evade the duty to bargain by refusing to hire its predecessors' employees because of their union affiliation. To establish whether a new employer's refusal to hire its predecessor's employees was driven by antiunion animus, the Board relies on the test set out in *Wright Line*, 251 NLRB 1083 (1980). Under *Wright Line*, "the General Counsel must [first] make a prima facie showing

sufficient to support the inference that protected [union] conduct was a motivating factor behind the [employer's action]." *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1010 (D.C. Cir. 2022) (cleaned up). "Once a prima facie case has been established, the burden shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 218 (D.C. Cir. 2016) (cleaned up). If the employer's reasons are pretextual, they do not rebut the prima facie showing of animus. *See id.* at 219–20.

As prima facie evidence of animus against the IAM, the Board pointed to two sets of facts. First, it found Everport had intentionally prioritized job applicants from the ILWU over those from the IAM in various ways—telling the ILWU about its vacant mechanic positions before the IAM; interviewing the ILWU's candidates before the IAM's; hiring less experienced ILWU applicants instead of better qualified IAM ones; and, on at least one occasion, telling an IAM applicant he could not be hired because of his union affiliation. Second, the Board found that Everport had used a secret hiring quota. Based on the testimony of three IAM-represented applicants, the Board determined Everport had resolved to give fifty-one percent of the available mechanic positions to ILWU-represented applicants and forty-nine percent to Marine and Miles' employees, so that a majority of its mechanics would be ILWU-represented. Everport and the ILWU do not contest these findings.

In response, Everport argued its hiring process was not discriminatory when properly viewed in light of the Longshore Contract. In staffing the Terminal, Everport's "only duty" was to hire its employees on "a basis other than hostility to a union," *Sierra Realty Corp. v. NLRB*, 82 F.3d 494, 496 (D.C. Cir. 1996), and it must be the case that the requirements of a Board-

sanctioned collective bargaining agreement can furnish a non-discriminatory rationale for a company's hiring decisions. The Board did not find, and does not argue, that Everport's initial decision to join the PMA was motivated by animus against the IAM. And as a general matter, the Board conceded that Everport's hiring process was "consistent" with the one required by the Longshore Contract. *Everport*, slip op. at 18. Therefore, if Everport's interpretation of the Longshore Contract were correct—if the Terminal's red-circle status had lapsed, requiring Everport to prioritize mechanic applicants from the ILWU and fill remaining vacancies through the Herman-Flynn process—it had a valid business reason for preferring ILWU applicants over IAM-represented ones.

Nevertheless, the Board explicitly declined to engage with Everport's reading of the Longshore Contract. The Board claimed Everport's invocation of its contract obligations was "pretextual," since it "did not remain neutral" and its "actions were pro-ILWU." *Id.* at 36–37. As evidence of Everport's bias, however, the Board pointed to the fact that it followed the hiring process required by the Longshore Contract. The Board's circular conclusion, in other words, was that Everport's asserted reason for prioritizing ILWU-represented job applicants could not be credited because Everport had prioritized ILWU-represented job applicants. That is not reasoned decisionmaking.

That leaves the Board's finding that Everport secretly employed a hiring quota. Since the Longshore Contract does not require quota-based hiring, Everport could not justify its decision to use one by pointing to its PMA membership.[3] The

---

[3] The Longshore Contract does not require quotas for hiring mechanics. Rather, as explained above, it simply obligates PMA

Board, however, failed to explain why a finding of animus towards the IAM necessarily followed from its finding that Everport used a quota. When viewed in context, it is possible that Everport adopted the quota in order to discriminate against the IAM's applicants. But the opposite conclusion is plausible too.

The record indicates that Everport more than once declined to hire qualified ILWU applicants, instead hiring better-qualified IAM ones.[4] The record also shows that "Everport's internal documentation [indicated] a preference for keeping the mechanic units as they existed" before the handover. *Id.* at 37. In light of these facts, it is at least possible that Everport used the hiring quota to hire *more* of the Terminal's incumbent mechanics than the Longshore Contract's terms allowed, but not so many as to trigger a clash for recognition between the ILWU and the IAM. If that were so, then Everport adopted the quota not from animus towards the IAM, but to favor IAM applicants in the hiring process.

The Board was required to set out "a rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (cleaned up). Here, it failed to reasonably explain why Everport's quota, viewed in light of the Longshore Contract, supported an inference of animus against the IAM. Instead, without explanation, it chose to ignore the substantial evidence that undercut its conclusion. *Cf. Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003) (holding that

members to exhaust all qualified ILWU applicants before offering vacancies to any non-ILWU applicant.

[4] Although the issue is not before us, we note the ILWU could have raised a claim that Everport violated the Longshore Contract by rejecting qualified ILWU applicants in order to hire Marine and Miles' former mechanics.

the Board's "clipped view of the record" did not support its finding that the employer had committed unfair labor practices). We therefore conclude that "the process by which the agency reached its judgment was neither logical nor rational." *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012) (cleaned up); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.").[5]

\* \* \*

The Board did not reasonably explain its conclusion that Everport was a *Burns* successor with a duty to bargain with the IAM. Therefore, its finding that Everport unlawfully refused to bargain with the IAM was arbitrary and must be vacated.

III.

We next address the Board's finding that Everport prematurely recognized the ILWU as its mechanics' representative and that the ILWU unlawfully accepted its recognition.

In most cases, an employer who recognizes a union before it employs a "substantial and representative complement of its projected work force" and is "engaged in normal business operations" commits an unfair labor practice. *Elmhurst Care Ctr.*, 345 NLRB 1176, 1177 (2005); *see generally Int'l Ladies Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–40 (1961). Here, the Board found that Everport recognized the

---

[5] For the reasons given in this subsection, the Board's conclusions that Everport discriminated against the IAM, and that the ILWU encouraged it to do so, must also be set aside.

ILWU repeatedly throughout the summer and fall of 2015, before it "employ[ed] any mechanics at the Terminal" or was "engaged in normal business operations." *Everport*, slip op. at 39. Therefore, the Board found that Everport's recognition of the ILWU as its mechanics' representative was premature.

Given the unique bargaining landscape in which Everport was operating, however, the Board needed to explain its decision to apply a rigid version of the premature recognition test to Everport and the ILWU. The Board has long permitted groups of employers to negotiate with their employees collectively through multiemployer bargaining units. *See Arbor Constr. Pers., Inc.*, 343 NLRB 257, 257–58 (2004); *cf. Brown v. Pro Football, Inc.*, 518 U.S. 231, 240 (1996) ("Multiemployer bargaining … is a well-established, important, pervasive method of collective bargaining."). The Board has recognized the PMA as the "multiemployer bargaining association" responsible for negotiating with the ILWU. *ILWU Loc. 19*, 266 NLRB 193, 194 (1983). It is undisputed that because of the Board's decision in *Shipowners*, it is not feasible to operate a West Coast port without joining the PMA. Finally, all PMA members are required to recognize the ILWU as their employees' bargaining representative. *See PMA*, 256 NLRB at 770 ("[E]mployers who join the PMA after the execution of the bargaining agreement are subject to its terms.").

If the Board's rigid view of the premature recognition test applied in this context, then *every* employer who joins the PMA—thereby committing to hire its longshoremen from the ILWU and to recognize the ILWU as their representative—commits an unfair labor practice the moment it joins. But that would make the system of collective bargaining the Board sanctioned in *Shipowners* nonsensical and unworkable: a port operator could not lawfully join the PMA before hiring its

workforce and it could not hire a workforce before joining the PMA. The Board neither acknowledged nor explained this apparent Catch-22, which is a telltale sign of arbitrary and capricious agency action. *See Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 49 (D.C. Cir. 2018) (vacating a Board order that left the employer "in a Catch-22").

IV.

Finally, the Board found that Everport committed an unfair labor practice when it imposed the Longshore Contract's terms on the Terminal's mechanics. For the reasons given above, neither of the Board's justifications for this conclusion was reasonable. First, the Board claimed that Everport lost the right to set its mechanics' initial terms and conditions of employment because it "used a general discriminatory hiring plan, applicable to *all* applicants from the predecessor workforce," which made it a "perfectly clear" *Burns* successor. *Everport*, slip op. 1 n.4. The Board's successorship finding was not reasonably supported, *see supra* Part II, so its ancillary finding that Everport was a perfectly clear successor was arbitrary *a fortiori*. Alternatively, the Board claimed that the terms and conditions imposed on the Terminal's mechanics were unlawful because they stemmed from Everport's premature recognition of the ILWU. Because the Board's purported application of the premature recognition test was unfounded and left Everport in an untenable Catch-22, the Board's alternative basis for its decision does not pass muster. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that agencies may not change their policies "*sub silentio*").

23

\* \* \*

For the foregoing reasons we grant the petitions for review, deny the Board's cross application for enforcement, and vacate the Board's order.

*So ordered.*